[No. E006810. Fourth Dist., Div. Two. Sept. 9, 1994.]

JUDITH KRUPNICK et al., Plaintiffs and Appellants, v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.*]**

---

*Parts I and III under the Discussion, involving claims for intentional infliction of emotional distress and claims for a "violation" of Civil Code section 1714, are not ordered published because they do not meet the criteria for publication contained in rule 976(b), California Rules of Court. See, also, rule 976.1(a). The balance of the opinion is ordered published.

## COUNSEL

Weldon Diggs and Linda M. Wilde for Plaintiffs and Appellants.

Hawkins, Schnabel & Lindahl, Kelley K. Beck, Rena M. Denton and Tina M. Bailer for Defendants and Respondents.

## OPINION

**McDANIEL, J.**\*—After Judith and Albert Krupnick (plaintiffs) had settled their personal injury action against their tortfeasor, Roy Hester, for $295,000, they yet remained distraught over the manner in which Hester's insurance company, Hartford Accident and Indemnity Company, and its

---

\*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.

employee John McWorter (defendants) had conducted the settlement nego-
tiations. As a result, they commenced the underlying litigation, seeking to
recover money, beyond the settlement noted, as recompense for their *purely
emotional distress.* Their action proceeded under a theory then viable under
*Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr.
842, 592 P.2d 329] (*Royal Globe*). That theory, now discredited (*post*),
permitted a direct action by a third party against the adverse, first party's
insurance carrier, in those instances where the carrier, in dealing with the
third party, had engaged in unfair settlement practices as defined in the
Insurance Code.

While plaintiffs' *Royal Globe*-type action was pending, the Supreme
Court, in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d
287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*), overruled *Royal
Globe. Moradi-Shalal* held that the Insurance Code provisions which define
unfair settlement practices were never intended by the Legislature to permit
a third party, civil action directly against an insurance company. (*Id.* at p.
304.) In the course of its opinion, *Moradi-Shalal* otherwise observed, with
regard to any presumed direct duty owed a third party claimant by an
insurer, that "[i]t tends to create a serious conflict of interest for the insurer,
who must not only protect the interests of its insured, but also must safe-
guard its own interests from the adverse claims of the third party claimant.
This conflict disrupts the settlement process and may disadvantage the
insured." (*Id.* at p. 302.)

As a consequence of the ruling in *Moradi-Shalal*, plaintiffs amended their
complaint to seek damages at common law based on the same facts which
they had alleged to constitute unfair settlement practices under the Insurance
Code. The complaint, *relying upon a single set of facts,* which decried
defendants' behavior in their conduct of settlement negotiations, sought
damages for: 1) intentional infliction of emotional distress; 2) negligent
infliction of emotional distress; and 3) "violation" of Civil Code section
1714. In response to such amended effort, the trial court, paying heed to the
*Moradi-Shalal* pronouncement noted, granted defendants' motion for judg-
ment on the pleadings as to all three counts.

Because the assignments of error as to counts one and three can be readily
disposed of under established precedents, the published portion of this
opinion will be confined to the issue of whether the pleaded facts under
count two state a cause of action for negligent infliction of emotional
distress.

Thus, in this post-*Molien*[1] era, we are here called upon to review an unsuccessful effort in the trial court by third party plaintiffs to recover money damages for purely emotional distress directly from their tortfeasor's insurance company. Such distress, as noted, allegedly arose because of the manner in which the settlement negotiations were conducted. In reality, this case, insofar as it involves a claim based on negligent infliction of emotional distress, amounts to a thinly disguised effort to persuade us, despite the overruling of *Royal Globe*, to include within the theories of common law liability for negligence, a cause of action based upon precisely the same facts as were actionable under the Insurance Code pursuant to *Royal Globe*, before that case was overruled. Our review will explain why the trial court was correct in granting the motion for judgment on the pleadings as to count two.

As to one of plaintiffs' contentions, there is nothing in the *Moradi-Shalal* language itself which supports this latter-day effort to engraft upon the common law a cause of action grounded upon an insurer's conduct reflecting those unfair settlement practices held actionable by *Royal Globe* under the Insurance Code but now discredited.

As to another of plaintiffs' contentions, such a cause of action is not sanctioned by particular language contained in *Moradi-Shalal*, language by which California litigants were assured by the Supreme Court that its decision to overrule *Royal Globe* did not foreclose "jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, *infliction of emotional distress*, and (as to the insured) either breach of contract or breach of the implied covenant of good faith and fair dealing." (*Moradi-Shalal, supra*, 46 Cal.3d 287, 304-305, italics added; hereinafter, the "reassuring language.") In our view, upon closer scrutiny, this "reassuring language" does not constitute a substantive holding; it only assures us, beyond the overruling of *Royal Globe*, that nothing has changed. As a consequence, it cannot and does not itself constitute recognition of a negligence action at common law, especially of the kind undertaken by plaintiffs here, *unless such action were already recognized*. That, of course, is what we are called upon to decide.

The trial court's ruling was correct, principally, because under precedent which has evolved since *Molien*, plaintiffs have failed to plead facts which bring them within that now-defined salient where claims for negligent infliction of purely emotional distress have come to be recognized. As a preface to later elaboration upon this conclusion, we must go back about 14 years to *Molien*. The Supreme Court in that decision extended the boundaries of negligence liability for purely emotional distress, unaccompanied by

---

[1] *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] (*Molien*).

physical trauma, beyond the small beachhead earlier staked out by *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. The *Dillon* foothold involved only special instances in so-called bystander cases. Since *Molien*, there have been at least 26 cases, sounding in negligence, in which the plaintiffs have sought recovery for purely emotional distress, *foreseeable in every instance.*

These cases are analyzed in *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398 [27 Cal.Rptr.2d 894] (*Bro*) and are collected and classified in an appendix to the opinion. (*Id.* at p. 1444.) Such analysis shows, in purely emotional distress cases based on negligence, that *not all succeed.* As appears in the *Bro* catalogue, only nine succeeded; seventeen failed. The *Bro* analysis draws on Supreme Court authority which makes clear, *because emotional distress is always foreseeable,* that any attempt to define duty in this kind of case in terms of foreseeability is useless, if not futile. (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1074 [9 Cal.Rptr.2d 615, 831 P.2d 1197] [*Burgess*]; *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 663-664 [257 Cal.Rptr. 865, 771 P.2d 814], [*Thing*].)

In view of the foregoing, the required inquiry here is whether the facts plaintiffs have pleaded fall on the liability or nonliability side of the line. Such a line has emerged since *Molien* as a result of some claims for negligent infliction of emotional distress succeeding and others failing. (*Bro, supra,* 22 Cal.App.4th 1398, 1444.) In short, just as in all negligence cases, to succeed, plaintiffs had to allege facts which raised a duty to exercise reasonable care in avoiding an impermissible infliction of emotional distress and a breach of that duty. This they failed to do.

More particularly, no one in this state has ever recovered damages for purely emotional distress in a negligence action unless he or she could first be characterized as a direct victim. (See *Bro, supra,* 22 Cal.App.4th 1398, 1417.) Moreover, it was not until *Burgess* was decided in 1992 that the Supreme Court provided a simple, working definition of "direct victim." *Burgess* announced that the presence of a preexisting relationship between the parties is that "which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess, supra,* 2 Cal.4th 1064, 1074.)

Under such definition, because plaintiffs did not enjoy the precedent-prescribed relationship with defendants, no duty of care arose and they were foreclosed from having their claim for negligent infliction of emotional distress evaluated to determine if a protected interest had been impermissibly invaded, just as were the plaintiffs foreclosed in 11 of the post-*Molien* cases cited in *Bro, supra,* 22 Cal.App.4th 1398, 1418, and tabulated at page 1444. We shall affirm the judgment accordingly.

## Factual and Procedural Background

### A.

### *The Antecedent Traffic-collision Action*

Roy Hester "rear-ended" the vehicle in which plaintiffs were riding, and plaintiffs were injured as a result. Five months later, plaintiffs filed the antecedent, traffic-collision action to recover personal injury damages from Hester (the insured) and from National Car Rental Systems, Inc., the company from which the insured had rented the car he was driving at the time of the collision. About two and one-half years later, pursuant to section 998 of the Code of Civil Procedure, the insured served plaintiffs with a statutory offer of compromise. Plaintiffs accepted the offer, and defendants promptly paid the amount offered in exchange for plaintiffs' dismissal with prejudice of the antecedent, traffic-collision action.

### B.

### *Synopsis Of Trial Court Proceedings*

The following year, plaintiffs here, who, as already noted, were the complaining party plaintiffs in the antecedent traffic-collision action, commenced the underlying litigation directly against defendants, pursuant to *Royal Globe, supra,* 23 Cal.3d 880, alleging breach of duties then perceived to be imposed upon civil litigants by section 790.03, subdivision (h) of the Insurance Code (unfair settlement practices). Defendants answered the complaint with a general denial of all the complaint's allegations, together with allegation of several affirmative defenses.

About a year later, while the underlying action was awaiting trial, the California Supreme Court, as noted, handed down *Moradi-Shalal, supra,* 46 Cal.3d 287. In *Moradi-Shalal,* also as earlier noted, the court overruled *Royal Globe (Moradi-Shalal, supra,* 46 Cal.3d 287, 304-305); however, the decision's impact was made prospective. The court ruled, with regard to cases then pending, that a *third party* could continue to maintain a *Royal Globe-*type statutory action against his tortfeasor's insurer *only if the third party's antecedent action had gone to judgment. (Id.* at p. 306.) Here, because they had chosen to settle their antecedent action by accepting a Code of Civil Procedure section 998 offer (*ante*), plaintiffs were barred by the applicable holding in *Moradi-Shalal* from pursuing further their *statutory cause of action* against defendants. (46 Cal.3d at pp. 304-305; *Laxague* v. *Fireman's Fund Ins. Co.* (1990) 220 Cal.App.3d 530, 535 [269 Cal.Rptr. 456], review den.)

As a consequence, defendants proceeded at once to notice a motion for judgment on the pleadings. Plaintiffs in turn noticed a motion for an order permitting them to file an amended complaint; the latter motion was granted, making the former moot. Plaintiffs' "First Amended Complaint for Damages" which followed (hereafter, the complaint) was styled as one for: 1) intentional infliction of emotional distress; 2) negligent infliction of emotional distress; and 3) breach of duty arising under Civil Code section 1714.

In count one plaintiffs alleged: 1) the fact of the liability policy issued to the insured by defendants; 2) the collision with the insured on April 29, 1983, resulting from his negligence and proximately causing their personal injuries; 3) at all times the insured's liability for the consequences of the collision was reasonably clear; 4) defendants were aware of plaintiffs' injuries, of their suffering and of their attendant financial hardship; 5) on September 25, 1985, defendants refused to make an offer to settle plaintiffs' claim, instead insisting to opposing counsel that plaintiffs had experienced preexisting injuries while defendants yet had no reasonable basis to believe such statements were true; 6) finally in April of 1986, defendants, through the insured and pursuant to section 998 of the Code of Civil Procedure, made a statutory offer of compromise in the amount of $295,000; 7) plaintiffs accepted the offer; 8) again, defendants at all times (before making the settlement offer) knew that the insured's liability was reasonably clear; 9) in July of 1985 defendants were in possession of sufficient medical and wage-loss information to enable them to make a settlement offer; 10) at all times defendants knew that plaintiffs were suffering severe emotional distress; 11) defendants' conduct in declining to settle was "outrageous and despicable," was "intentional and malicious" and was done for the purpose of causing plaintiffs mental anguish and emotional distress; and 12) defendants' conduct was done with a conscious disregard of plaintiffs' rights and with intent to vex, injure or annoy plaintiffs, such as to constitute oppression, fraud or malice pursuant to Civil Code section 3294.

In count two, plaintiffs incorporated *all of the foregoing* and went on to allege: 1) defendants at all times knew that the insured's liability was reasonably clear, giving rise to a duty to effectuate a prompt, fair and equitable settlement; 2) defendants knew that plaintiffs had a deep-rooted emotional and financial need to be quickly compensated for their injuries arising from the collision with the insured; 3) defendants knew that their own refusal to effectuate a prompt settlement was causing severe emotional distress to plaintiffs; 4) defendants' conduct was intentional and malicious and done for the purpose of causing mental anguish and physical distress; 5) plaintiffs as third parties were entitled to insurance benefits arising from the negligence of the insured, and plaintiffs were owed a duty of care by

defendants in the settlement of plaintiffs' claim; 6) defendants negligently, carelessly and recklessly failed to make a determination of the information necessary to settle plaintiffs' claims; 7) as a proximate result of the foregoing conduct plaintiffs suffered damages in an amount to be shown at trial; 8) the foregoing conduct was outrageous and despicable in that defendants knew that the insured's liability was reasonably clear; 9) plaintiffs suffered lasting and endurable distress over a period of three years during which defendants failed to acknowledge plaintiffs' losses incurred by reason of the collision with the insured.

In count three, plaintiffs incorporated *all of the allegations* of counts one and two and then went on to repeat them variously within the context of a claim made purportedly within the scope of Civil Code section 1714, subdivision (a).

Defendants' answer to the amended complaint posed a general denial under section 431.30 of the Code of Civil Procedure, plus four affirmative defenses, including that each of plaintiffs' counts failed to state facts constituting a cause of action.

Defendants then pressed another motion for judgment on the pleadings. This time, defendants argued that their delay in offering to settle did not amount to the kind of outrageous conduct necessary to justify a cause of action for intentional infliction of emotional distress. Otherwise, defendants argued they owed plaintiffs no duty to settle; hence, they argued further, any delay in offering to settle did not provide the factual predicate to state a cause of action for negligence, under either the common law or section 1714 of the Civil Code.

After a hearing on defendants' motion, *at which plaintiffs' counsel did not appear*, the motion was granted. A formal order was then filed, granting the motion and entering judgment for defendants. This appeal followed.

### Discussion

In pursuing their appeal, plaintiffs make three assignments of error which they present in the form of questions. "1. Can appellants state a cause of action for intentional infliction of emotional distress? [¶] 2) Can appellants state a cause of action for negligent infliction of emotional distress? [¶] 3) Can appellants state a cause of action for *violation* of Civil Code section 1714?" (Italics added.) We shall address each assigned error in turn in parts I, II, and III of this opinion; only part II of these three meets the criteria for publication under rule 976(b) of the California Rules of Court.

# I.

## CAN PLAINTIFFS STATE A CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

# II.

## CAN PLAINTIFFS STATE A CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS?

In this part of the opinion, we shall undertake to demonstrate why the trial court was correct in granting defendants' motion for judgment on the pleadings as to count two. In that count, plaintiffs proceeded under a common law theory of entitlement to damages for negligent infliction of emotional distress.

## A.

### *Contrary to Plaintiffs' Contention, Nothing in Moradi-Shalal "Sanctions" a Common Law Action for Negligent Infliction of Emotional Distress*

In their opening brief, plaintiffs contend that *Moradi-Shalal* "specifically sanctioned" a common law cause of action for *negligent* infliction of emotional distress in third party cases. That decision did no such thing. More particularly, in their opening brief, invoking *Moradi-Shalal*, plaintiffs assert that, "the insurer has a duty to third-party claimants to effectuate a prompt, fair settlement when liability becomes reasonably clear." At this point, plaintiffs' opening brief refers us to pages 307-308 of *Moradi-Shalal*. Plaintiffs have misread the cited pages. In *Moradi-Shalal, supra*, 46 Cal.3d 287, the Supreme Court, after overruling *Royal Globe* (*id.* at p. 304), was confronted with the question of how the ruling would be applied to pending cases. Thus, beginning at page 305, the *court was solely concerned* with deciding which *pending Royal Globe*-type cases would be permitted to proceed. It was in this limited context that the foregoing observation about a duty to settle was made. On such issue, the court finally concluded, based on *Nationwide Ins. Co.* v. *Superior Court* (1982) 128 Cal.App.3d 711, 714 [180 Cal.Rptr. 464], that only in those pending cases, where the antecedent, *third party action had proceeded to final judgment*, could plaintiffs continue with prosecution oftheir statutory cause of action, regardless of the duty to settle in a *Royal Globe* context. (*Moradi-Shalal, supra*, 46 Cal.3d 287, 309-311.)

*See footnote, *ante*, page 185.

In reaching the foregoing conclusion, *Moradi-Shalal* recited the pronouncements by Justice Richardson in his dissent in now overruled *Royal Globe*. With reference thereto, the court in *Moradi-Shalal* stated, "Confirming Justice Richardson's prediction in his *Royal Globe* dissent, several commentators have observed that the rule in that case promotes multiple litigation, because its holding contemplates, indeed encourages, two lawsuits by the injured claimant: an initial suit against the insured, followed by a second suit against the insurer for bad faith refusal to settle. [Citations.] As a corollary, *Royal Globe* may tend to encourage unwarranted settlement demands by claimants, and to coerce inflated settlements by insurers seeking to avoid the cost of a second lawsuit and exposure to a bad faith action. [Citations.] [¶] Thus, one author observed, 'One result of this decision is that every time a demand is now made to settle a lawsuit, an additional demand is likely to be forthcoming to coerce higher settlements. The demand now carries the threat that, unless settlement is immediate, a separate suit will be filed for violation of the Unfair Practices Act. The public ultimately will be affected by the additional drain on judicial resources. Moreover, the public will indeed suffer from escalating costs of insurance coverage, a certain result of inflated settlements and costly litigation.' [Citation.] [¶] Other commentators agree that *Royal Globe*, and its allowance of a direct action against the insurer, may result in escalating insurance costs to the general public resulting from insurers' increased expenditures to fund coerced settlements, excessive jury awards and increased attorney fees. [Citations.] As stated by one writer, 'The increased settlement costs required to settle the actual lawsuit and the potential one that hovers over most litigation involving an insured defendant will obviously result in higher premiums. In addition, those insurers that have the courage to refuse settlement where they do not feel it is warranted will necessarily be the subject of additional litigation because they will not in all instances have guessed correctly regarding the value of the case. When they have guessed incorrectly, *Royal Globe* encourages lawsuits against them.' [Citation.] [¶] Most authors have noted another unfortunate consequence of our holding in *Royal Globe* that insurers owe a direct duty to third party claimants: It tends to create a serious conflict of interest for the insurer, who must not only protect the interests of its insured, but also must safeguard its own interests from the adverse claims of the third party claimant. This conflict disrupts the settlement process and may disadvantage the insured. [Citations.]" (*Moradi-Shalal, supra*, 46 Cal.3d 287, 301-302.) *To countenance a common law action by third parties directly against insurance companies would restore the precise evils which Justice Richardson delineated and deplored above.*

In sum, it is clear that nothing in the *Moradi-Shalal* language itself supports a contention that it "specifically sanctioned" a cause of action, on the pleaded facts, for negligent infliction of emotional distress. It did not.

As another basis for their contention that *Moradi-Shalal* "specifically sanctioned" a common law cause of action for negligence resulting in purely emotional distress, plaintiffs also rely upon what we have above referred to as the "reassuring language," quoted at the outset. (*Moradi-Shalal, supra,* 46 Cal.3d 287, 304-305.)

Implicit in plaintiffs' contention is that the "reassuring language" of *Moradi-Shalal* necessarily imports conclusions that either: (1) a right of action based on negligent infliction of emotional distress existed before the decision, or (2) ipse dixit, the decision created a new right of action where none existed before. We seriously doubt the latter proposition. In the decision itself, the Supreme Court in that portion of the opinion entitled, "Royal Globe Should Be Overruled," stated plainly, ". . . nothing we hold herein would prevent the Legislature from creating additional civil or administrative remedies, including, of course, creation of a private cause of action for violation of section 790.03. We hold, however, that thus far the Legislature has not manifested an intent to create such a private cause of action." (*Moradi-Shalal, supra,* 46 Cal.3d 287, 305.)

Otherwise, the thrust of the "reassuring language" was just that, i.e., overruling *Royal Globe* did not foreclose jurisdiction to impose remedies based on such traditional theories as "infliction of emotional distress." (*Moradi-Shalal, supra,* 46 Cal.3d 287, 305.) As observed in our discussion of intentional infliction of emotional distress (*ante*), the traditional theory alluded to in the cited passage did not specify either *intentional* or *negligent* infliction of emotional distress. Thus, in that part of the opinion, we simply marshalled the authorities involving intentional infliction of emotional distress and rationalized the result reached on the basis of those authorities. A similar exercise is called for in this part of the opinion.

In other words, we interpret the "reassuring language" as not making a substantive statement. It simply recited assurances that whatever remedies existed at common law, within the listed subject matter areas, remained unaffected by the overruling of *Royal Globe*. Thus, our decisional task here is to determine whether plaintiffs' claim belongs among those post-*Molien* decisions where recovery was allowed or belongs among those where recovery was denied, regardless of *Moradi-Shalal*.

B.

*Only Since 1980 Has California Recognized Claims for Negligent Infliction of Emotional Distress*

The decisional task noted calls first for an inquiry into the historical origin of a claim for negligent infliction of emotional distress and what has

happened since its advent. Commenting on such claims, Witkin observes, "[i]n this borderland of tort liability, until recently the California law (see *infra*, § 852) was in accord with the majority view that no liability is incurred where neither physical injury or impact is shown." (6 Witkin Summary of Cal. Law (9th ed. 1988) Torts, § 851, p. 209.) His section 852 above referred to includes the statement, "[i]n *Molien* v. *Kaiser Foundation Hosp.* (1980) 27 C.3d 916 . . . the court, citing *Allen* v. *Jones* [(1980) 104 Cal.App.3d 207 (163 Cal.Rptr. 445)], and a Hawaii case (27 C.3d 927, 928), abrogated the rule." (*Id.* at p. 210.)

In his Summary of California Law, Witkin discusses a group of emotional distress cases decided since *Molien*. In this group, he has identified, on the one hand, the few cases where recovery was allowed, including *Marlene F.* v. *Affiliated Psychiatric Medical Clinic* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278] (*Marlene F.*) and *Burgess, supra*, 2 Cal.4th 1064, and, on the other, the larger number of cases where recovery was denied, including *Anderson* v. *Northrop Corp.* (1988) 203 Cal.App.3d 772 [250 Cal.Rptr. 189], and *Schwarz* v. *Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470]. (6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 853, 854, pp. 213-217, and 1994 supp. pp. 74-82.) In *Anderson* and *Schwarz*, although pre-*Burgess* cases, both plaintiffs yet failed because of their inability to establish duty for want of being "direct victims" (*post*).

## C.

### *Since Molien, More Have Failed to Recover Than Have Succeeded*

In a recent case published by this division, we had occasion to pass upon a claim for purely emotional distress in which the parents, despite the absence of medical malpractice, were yet distressed over the manner in which their child had been presented to them by the defendant doctor, following her birth by caesarean section. (*Bro, supra*, 22 Cal.App.4th 1398, 1401.) In the course of the decision, we analyzed 26 post-*Molien* cases, presenting claims for purely emotional distress, to determine if there were a common ratio decidendi among them. We discovered that there was not. (*Id.* at p. 1417.)

However, we did find statistical confirmation for Witkin's classification of cases into those where recovery was allowed and those where recovery was denied. In our 26-case catalogue, 9 allowed recovery; 17 did not. (*Bro, supra*, 22 Cal.App.4th 1398, 1444.) Reflecting these results, we emphasize again that our decisional task here is to decide whether plaintiffs' claim belongs among those where recovery was allowed or belongs among those where recovery was denied.

## D.

### *Plaintiffs Have Not Alleged Facts Which Imposed a Duty of Care on Defendants*

1. *Their Theory of Duty Is Mistakenly Based on Rowland* v. *Christian*

In urging that their complaint states a cause of action for negligent infliction of emotional distress, plaintiffs invoke *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*), a pre-*Molien* case which derived from a mundane set of facts. Plaintiff, a social invitee in defendant's apartment, suffered *physical injury* to the tendons and nerves of his right hand while using what turned out to be a defective faucet handle on a bathroom fixture. Summary judgment in favor of the defendant apartment dweller was reversed by the Supreme Court which, as a starting point for rationalizing its decision, invoked Civil Code section 1714. In doing so, it noted that "[t]his code section . . . states a civil law and not a common law principle." (*Id.* at p. 112.) *Rowland* then recited language which has been widely quoted ever since. "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exception to the fundamental principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy." (*Id.* at p. 112.)

After announcing this principle, *Rowland* proceeded to recite the considerations, above noted, which should be taken into account to determine in a given instance whether, *as a public policy matter,* an exception should be made to the imposition of liability otherwise required by Civil Code section 1714 *if the conditions therein recited be met.* In their reliance on *Rowland,* plaintiffs describe it as holding, "whether an actionable duty exists depends upon judicial weighing of the policy considerations for and against the imposition of liability under the circumstances." Plaintiffs then apply these policy considerations to reach their position "that the insurer owed the insured claimants a duty [of] care in the settlement of their case."

The foregoing distorts and therefore misapplies *Rowland,* even accepting that it is relevant here, which we do not. The discussion in *Rowland* springs from that decision's reliance on section 1714, subdivision (a) of the Civil Code. As pertinent here, that statute provides that "every one is responsible . . . for an *injury* occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." (Italics added.)

*Rowland* involved circumstances *where both duty and breach were already held to be present*, following which it pursued an evaluation in light of the seven policy considerations to determine whether an *exception to liability* should be allowed.

At this juncture, we are compelled to point out that *Rowland* was a personal injury case. To assess the precedential relevance of *Rowland* (and Civil Code section 1714) to the pleaded facts, it is necessary to determine *Rowland's* actual holding.

According to Witkin, "[t]he *ratio decidendi* [holding of case] is the principle or rule which constitutes the ground of the decision, and it is this principle or rule which has the effect of a precedent. It is therefore necessary to read the language of an opinion in the light of its facts and the issues raised, to determine (a) which statements of law were necessary to the decision, and therefore binding precedents, and (b) which were arguments and general observations, unnecessary to the decision, i.e., dicta, with no force as precedents." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 783, p. 753.)

One of the cases cited by Witkin in this section of his volume dealing with appeals which illustrates the principle described is *Security Pacific National Bank* v. *Wozab* (1990) 51 Cal.3d 991 [275 Cal.Rptr. 201, 800 P.2d 557] (*Security Pacific*). That case incisively stated the principle involved. " ' "It is the general rule that the language of an opinion must be construed with reference to the facts presented by the case, and *the positive authority of a decision is coextensive only with such facts.* . . ." ' " (*Id.* at pp. 1003-1004, italics added.)

As above pointed out, the plaintiff in *Rowland* had suffered a personal (physical) injury. The contested issue, for which *Rowland* fashioned the seven considerations with regard to the application of Civil Code section 1714, was whether liability for a personal injury should be imposed on the defendant apartment dweller and in favor of the plaintiff invitee. Justice Burke's dissent, as a matter of stare decisis, came down on the side of continuing to exempt the apartment dweller from duty and hence liability. Thus, the ratio decidendi in *Rowland* was that in cases of personal (physical) injury, the duty of care expressed in section 1714 will be extended to occupiers of real property vis-à-vis their invitees. *As a matter of judicial precedent, Rowland had absolutely nothing to do with the negligent infliction of emotional distress.* In other words, because its holding can only be coexistensive with its facts, *Rowland* is inapposite to the issue before us. (*Security Pacific, supra,* 51 Cal.3d 991, 1004.) Plaintiffs concede as much in

their opening brief when they recited that, "Rowland presents an interesting example, wherein common law trespasser and licensee restrictions on recovery from possessors of land [were] abrogated."

The foregoing view of *Rowland* is confirmed by a footnote in *Thing*, *supra*, 48 Cal.3d 644, discussed (*post*) on another point. As relevant here, the footnote recites, ". . . that *Rowland* v. *Christian* [citation] should extend to actions for negligent infliction of emotional distress lacks support in our decisions. Neither *Rowland* v. *Christian* nor the other cases cited by the [*Thing*] dissent [including *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 (131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166), and *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 799 (123 Cal.Rptr. 468, 539 P.2d 36)] are cases in which damages for negligently inflicted emotional distress were in issue. Recovery of this type of damage, when no other injury is present, has never been subject only to the general principles of foreseeability applied in *Rowland* v. *Christian* . . . ." (48 Cal.3d at p. 668, fn. 11.)

Based upon the foregoing analysis, there is nothing in *Rowland* to support plaintiffs' position that it is authority for imposing a duty of care to avoid unintentionally inflicting emotional distress on plaintiffs in the course of negotiating settlement of their third party claim.

By invoking *Rowland*, whose holding (*supra*) includes reliance upon Civil Code section 1714, plaintiffs cannot rationalize their position logically without a key assumption. Such assumption is that what plaintiffs experienced here was an "injury." We respectfully suggest that is precisely the issue which we are called upon to decide.

We have already noted that, in pertinent part, section 1714, subdivision (a), of the Civil Code provides that "[e]very one is responsible . . . for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." This concise statutory pronouncement imports the concept of both duty and breach. The mandate of this duty is to act with ordinary care and skill in the management of one's property and person. Breach of that duty occurs when a want of ordinary care in such management causes an injury. The result is liability, i.e., "responsibility."

Thus, consideration of the seven *Rowland* factors can only occur if it first be determined that there is a duty present and that it has been breached. We insist again that that is what this case is all about, *not* a *Rowland* evaluation to determine if an exception to liability, *already determined*, shall be allowed.

## 2. *In Seeking the Presence of Duty, Foreseeability Is Not a Useful Guideline in Cases Based on Negligent Infliction of Emotional Distress*

In personal injury (physical trauma) cases, foreseeability, going back to *Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253], has long been the key factor in fixing duty. However, when the claim is for purely emotional distress, it is our view that foreseeability is essentially useless. Emotional distress is always foreseeable. Moreover, the cases, decided since *Molien* introduced the notion of a compensable claim for purely emotional distress, show that in more instances than not claims advanced on this theory fail. (*Bro, supra,* 22 Cal.App.4th 1398, 1444.) Such results therefore provide the basis for a deductive conclusion that foreseeability, because always present, as noted, is of little use in the search for duty in purely emotional distress cases. If it were of any use in this search, every post-*Molien* suitor would have recovered. As shown in *Bro,* they did not.

This deduction of the useless nature of foreseeability in this kind of case is reflected in decided authority. In *Thing, supra,* 48 Cal.3d 644, a post-*Dillon,* bystander case, Justice Eagleson took occasion to clarify the right to recover for negligent infliction of emotional distress. He wrote, "[t]he *Dillon* experience confirms, as one commentator observed, that '[f]oreseeability proves too much. . . . Although it may set tolerable limits for most types of physical harm, *it provides virtually no limit on liability for nonphysical harm.*'" (*Id.* at p. 663, italics added.) He then stated that, "[i]t is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury." (*Id.* at p. 664.) Confirming our earlier observation that not every claim for purely emotional distress is compensable, *Thing* then stated, "In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited." (*Id.* at p. 664.) In view of the foregoing, we cannot resist recalling that Witkin is oft wont to lyricize, in the course of his many and storied public orations, "on a clear day some courts can foresee forever."

The repudiation in *Thing* of foreseeability in emotional distress cases, as a practical matter, was echoed three years later in *Burgess.* In its discussion of *Molien, Burgess* observed that "[t]he great weight of this criticism [of *Molien*] has centered upon the perception that [it] introduced a new method for determining the existence of a duty, limited only by the concept of foreseeability. To the extent that *Molien . . .* stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts. As

recognized in *Thing*, 'it is clear that foreseeability of the injury alone is not a useful "guideline" or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress]' [citation.]." (*Burgess, supra*, 2 Cal.4th 1064, 1074.) In view of the foregoing, it is obvious that something more than foreseeability must be present to raise a duty of care in emotional distress cases based on negligence.

3.

*The Presence of Duty Finally Depends on Public Policy Factors*

We have already recounted historically that it has only been since 1980, when *Molien* was decided, that claims for purely emotional distress in favor of nonbystanders have been recognized. Since *Molien*, there have been at least 26 attempts to recover damages under the *Molien* theory. Of these, 11 failed because the plaintiffs did not articulate persuasive pubic policy reasons why a duty of care was owed by the respective defendants. (*Bro, supra*, 22 Cal.App.4th 1398, 1444.)

Plaintiffs here urge that a new predicate for recovering damages for negligent infliction of emotional distress be recognized. They contend that a duty of care is owed a third party claimant by his or her tortfeasor's liability insurance carrier in negotiating settlement of the third party's claim. No such duty has been yet recognized in this state, and so we come to the proposition that it is incumbent upon plaintiffs to articulate why, as a legal proposition, a common law duty of care was owed them by defendants, who acted as Hester's liability insurance carrier.

That is the way common law tort theories have evolved. Actually, the initial recognition of a cause of action based on negligence was, pure and simple, a policy decision of the common law, i.e., the court created a duty of care to strangers where none before had existed.

When *Dillon* v. *Legg, supra*, 68 Cal.2d 728, introduced liability for purely emotional distress in so-called bystander cases, Justice Tobriner did not make the assumption at the outset that Mrs. Dillon had suffered an injury and then go through a *Rowland*-like litany in trying to decide whether liability for the injury should be excepted. On the contrary, he recited an elaborate array of policy reasons why a duty of care should be recognized. As to duty, he stated, " '[i]t [duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular

plaintiff is entitled to protection.' " (*Id.* at p. 734, quoting Prosser, Law of Torts (3d ed. 1964) pp. 332-333.)

Justice Mosk employed a similar technique in *Molien* when he extended the *Dillon* beachhead to purely emotional distress cases. He realized full well that an extension of the concept of duty was an issue when he stated that "[w]e thus reach the crucial question whether adherence to the venerable rule [of requiring physical impact] that would bar recovery in this case is warranted." (*Molien, supra,* 27 Cal.3d 916, 927.) He then went on to explain why California should not adhere to the "venerable rule." In doing so, Justice Mosk relied upon an observation by Justice Gardner in his concurring opinion in our decision in *Allen* v. *Jones* (1980) 104 Cal.App.3d 207 [163 Cal.Rptr. 445] (a mortuary case) and a Hawaii case, *Rodrigues* v. *State* (1970) 52 Hawaii 156 [472 P.2d 509]. In *Molien,* Justice Mosk wrote, ". . . the *Rodrigues* court further noted the 'multiplication of psychic stimuli' that society presently faces, and the 'increasing widespread knowledge of the debilitating effect mental distress may have on an individual's capacity to carry on the functions of life.' (*Ibid.*) Accordingly, the court recognized that 'the interest in freedom from negligent infliction of serious mental distress is entitled to independent legal protection. We hold, therefore, that there is a duty to refrain from the negligent infliction of serious mental distress.' (*Ibid.*)" (27 Cal.3d at p. 928.)

We can ask no less of plaintiffs here. We repeat, it is not enough to *assume* a duty of care and to *assume* a breach and then, based on such assumptions, to invoke the *Rowland* considerations of whether liability *should be excepted.* Rather, it is incumbent on plaintiffs, as noted, to come forward with policy reasons why a duty of care in their favor should be recognized by the common law. This they have failed to do.

Plaintiffs' statement of their position that count two states a cause of action for negligent infliction of emotional distress is circular at best. They first contend that they are "direct victims" under *Molien.* (Under the *Burgess* definition, *post,* they were not direct victims.) They then jump ahead to the conclusion that "one can see that all the elements of the tort itself are present . . . (1) a legal duty to use due care; (2) a breach of such legal duty; (3) damage or injury; and (4) the breach as the proximate cause or legal cause of the resulting damage or injury." They then cite to Witkin, 4 Summary of California Law (8th ed. 1974) section 488, page 2749 and to *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 938 [122 Cal.Rptr. 470]. The citation to Witkin has nothing to do with actions for negligent

infliction of emotional distress. The language in *Jarchow* purporting to sanction a common law action for negligent infliction of emotional distress against a title insurance company by a person to whom it had issued a policy was expressly disapproved in *Soto* v. *Royal Globe Ins. Co.* (1986) 184 Cal.App.3d 420 [229 Cal.Rptr. 192] (*Soto*). In this regard, we said, ". . . we therefore expressly overrule that portion of the *Jarchow* opinion which purports to recognize a cause of action for recovery of damages for emotional distress based on garden-variety negligence concepts. . . ." (*Id.* at p. 434.)

In their failure to articulate reasons why a duty of care should be imposed on defendants, what plaintiffs overlook is that defendants had a *contract of indemnity* with their insured Hester, not with plaintiffs. Under that contract, defendants' only duty was to indemnify Hester for any judgment entered against him on account of *his* negligence. After the collision, plaintiffs had no claim against defendant *insurers*; they had a claim only against the *insured*, Hester. With the parties in this posture, there was no legal reason or requirement for the insurance carrier ever to have anything to do with plaintiff third party claimants. In other words, defendants, acting within their legal rights, could have stood back and allowed the antecedent traffic-collision action to take its course. Should that case have gone to judgment against Hester, defendants would then have been required to indemnify Hester under the insurance contract.

However, when, as here, third party claims are settled by an insurer *before judgment*, the reality is that such settlement does not depend upon a duty to settle but derives from the insurer's educated gamble that it is probably cheaper to settle than to risk allowing the case against its insured to go to trial and judgment, especially if the judgment is likely to exceed policy limits. (See *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1978) 15 Cal.3d 9, 17, fn. 7 [123 Cal.Rptr. 288, 538 P.2d 744].) In light of the foregoing, plaintiffs' view of this case is wholly out of touch with the economic goals which give rise to contracts of insurance in the first place. Insurance companies exist to provide a critical financial indemnity *for the risks of their insureds*, not to salve the feelings of displeased third party claimants. As an actuarial matter, there is no way to factor in the emotional distress of third party claimants in trying to compute the premiums to be charged for the risks faced by the insured policy holders. Thus, it is reasonable to conclude that the overruling of *Royal Globe* by *Moradi-Shalal* served to reinforce the realities of the casualty insurance market place, not to change them.

E.

*Under Current Precedent, Plaintiffs Have Failed to Demonstrate They Were
Owed a Duty of Care by Defendants*

In the course of our opinion in *Bro*, we reported the precedential history
that "to recover damages for purely emotional distress in nonbystander
cases, it is first necessary to be a direct victim." (*Bro, supra*, 22 Cal.App.4th
1398, 1407.) This statement was followed by an inquiry into where the
"direct-victim" concept came from.

That inquiry proceeded through several cases, culminating in an analysis
of *Burgess*. (*Bro, supra*, 22 Cal.App.4th 1414-1416.) Such analysis included
our commentary that ". . . the *Burgess* court, as earlier noted, *pointedly
discounted foreseeability* [original italics] as a meaningless guideline for
measuring duty in this kind of case (*Burgess, supra*, 2 Cal.4th 1064, 1074),
and then concluded nevertheless that '. . . other principles derived from
*Molien* . . . are sound: (1) damages for negligently inflicted emotional
distress may be recovered in the absence of physical injury or impact, and
(2) a cause of action to recover damages for negligently inflicted emotional
distress will lie, notwithstanding the criteria imposed upon recovery by
bystanders, in cases *where a duty arising from a preexisting relationship is
negligently breached.*' (*Id.* at p. 1074, italics added, citing *Marlene F.*) In
sum, *Burgess* reaffirmed the *Molien* seminal pronouncement that actions by
direct victims of negligently inflicted emotional distress are viable. (*Burgess,
supra*, 2 Cal.4th 1064, 1074.)" (*Id.* at p. 1415, italics in original.)

In *Burgess*, there is certain language cited from *Marlene F.*, postulating
that a direct victim may be anyone to whom the defendant owed a duty of
care because such duty was " 'assumed by the defendant or imposed on the
defendant as a matter of law, or . . . [arose] out of a relationship between
the two.' " (*Burgess, supra*, 2 Cal.4th 1064, 1073, quoting from *Marlene F.*,
*supra*, 48 Cal.3d 583, 590.) As a result of this language, if it be argued that
there are three ways in which a duty of care can arise in favor of a third party
claimant against his or her tortfeasor's insurance company, we reject such
argument.

In *Marlene F.* the relationship was patient and psychotherapist; in *Burgess*,
it was patient and obstetrician. Thus, the language which talked about a duty
imposed by law or assumed by a defendant was unnecessary to the decision.
As such, that language was dicta.

We note again the *Security Pacific* rule which was applied in our earlier
discussion of *Rowland*. ██ ██ That rule stated plainly that the hold-
ing of a decision " ' "must be construed with reference to the facts presented

by the case, and the positive authority of a decision is *coextensive only* with such facts." ' " (*Security Pacific, supra*, 51 Cal.3d 991, 1003-1004, italics added.) In light of this proposition, we repeat that any references in *Burgess* or *Marlene F.* to alternatives, beyond a preexisting relationship, as characterizing the origin of a duty of care to one claiming damages for negligent infliction of emotional distress were dicta. The ratio decidendi of *Burgess* is contained in the language, ". . . (1) damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached. [Citing cases.] In fact, it is this later [*sic*] principle which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess, supra*, 2 Cal.4th 1064, 1074.) It is this language which is "coextensive" with the actual facts in *Burgess* and hence represents the precedential holding of that case. (See *Security Pacific, supra*, 51 Cal.3d 991, 1004.)

As above demonstrated, the only precedential holding in *Burgess*, as it related to the definition of a direct victim, is that one must have had a preexisting relationship with the defendant in order to have a protected interest in being free from unintentionally caused emotional distress. There was no such relationship between the parties here. The only relationship that ever developed between them, if it can be called such, was the result of this litigation, initiated by plaintiffs. As a consequence, plaintiffs could never be or become direct victims of defendants' unintentional behavior.

As earlier noted, there is no California case, *sounding in negligence*, including *Molien*, where a person has recovered on a claim for purely emotional distress unless he or she first qualified as a direct victim. (See *Bro, supra*, 22 Cal.App.4th 1398, 1444.) Because plaintiffs were never direct victims, they were never owed a duty of care. Thus, they are precluded from pursuing their emotional distress claim based on negligence, just as the plaintiffs, who were found not to be direct victims in 11 of the post-*Molien* cases, were so precluded. (See *Bro, supra*, 22 Cal.App.4th 1398, 1418, 1444.)

Parenthetically, we hark back to our observation that the true holdings in both *Burgess* and *Marlene F.*, with reference to the predicate for duty, were that the duty in each of those cases arose from preexisting relationships of obstetrician and psychotherapist, respectively. Here, we observe further, even if it be accepted that the holdings of those two cases could be enlarged to recite that duty can be present where " 'assumed by the defendant or

imposed on the defendant as a matter of law . . .' " (*Burgess, supra,* 2 Cal.4th 1064, 1073), that would not save plaintiffs' effort to plead a cause of action for the negligent infliction of emotional distress.

First, defendants did not assume any duty of care to plaintiffs. More important, even if the law stands ready to impose a duty of care on defendants here, before it does so, plaintiffs must show why the law should impose a duty. Actually, in terms of the legal dynamics which underlie these cases, where there is a preexisting relationship, because of that posture of the parties, the law "imposes" a duty of care. There can be no imposition of duty in a vacuum; there has to be a reason for it. As we have already noted, plaintiffs have failed to articulate a reason why the law should impose a duty of care on defendants in negotiating settlement of plaintiffs' third party claim.

Beyond the no-direct-victim rationale above explained, plaintiffs are confronted with decided cases where third parties have failed in their efforts to recover damages from their tortfeasor's insurance company for negligent infliction of emotional distress.

*Soto,* earlier referred to briefly, was a case on similar facts decided by this division in favor of the defendant insurance company. In that case, an employee and his family brought an action against his employer's workers' compensation carrier, alleging both intentional and negligent infliction of emotional distress. The plaintiffs' grievance arose from a delay in the carrier's payment of a workers' compensation award, a delay occurring after the carrier had stipulated to the award in the course of a Workers' Compensation Appeals Board (WCAB) proceeding. The later complaint included counts based on alleged violation of those Insurance Code provisions defining unfair settlement practices, as well as on alleged breach of the implied covenant of good faith and fair dealing. Of more interest to us here was the count for negligent infliction of emotional distress *alleged by the plaintiff family members.*

*The trial court sustained the defendant insurance carrier's demurrer to all counts without leave to amend.* On appeal, we affirmed the judgment of dismissal.

In rationalizing the result we reached, we noted that the alleged willful delay in payment did not provide the plaintiff employee with a viable claim based on a supposed exception to the exclusive remedy rule specified in section 3602 of the Labor Code such as was recognized by *Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616 [102 Cal.Rptr. 815, 498 P.2d 1063]. As to the claim of the family members, who were foreseeably and

understandably distressed, we held, because they were not "direct victims," they were precluded from recovery for negligent infliction of emotional distress. (*Soto, supra,* 184 Cal.App.420, 432.)

While *Soto* is not precisely "on all fours" with the facts here under review, because the family members are one step removed from being third parties, their posture is close enough to provide an arguably analogous precedent. In *Soto,* the count of the third party claimant (employee) was ruled out because of the exclusive remedy (under the Labor Code) rule. The trial court also ruled against the count of his family members against the workers' compensation insurance carrier. Their emotional distress arose by reason of the delay in payment of the award the carrier had stipulated to. We see no difference between the aggravation experienced by the employee in *Soto* and that experienced by his family. More important, the family members, like the employee, could not point to a preexisting relationship with the insurance company. Thus, they likewise were precluded from being direct victims. For this reason, *Soto* is persuasive authority adverse to plaintiffs' contention that defendants owed them a duty of care in negotiating their third party claim.

In *Lee* v. *Travelers Companies* (1988) 205 Cal.App.3d 691 [252 Cal.Rptr. 468] (*Lee*), after the plaintiffs had settled their legal malpractice claim against the insureds for $800,000, they (plaintiffs) filed suit against the defendant insurers alleging, as did plaintiffs here, that the insurers had engaged in unfair settlement practices as defined in section 790.03 of the Insurance Code. As examples thereof, they pointed to the insurers' initial offer of only $51,500 and to the fact that the insureds' liability had been well known to the insurers for *five* years before the claim was finally settled. (*Id.* at pp. 693-694.) After the trial court sustained the defendants' demurrer without leave to amend, the case was dismissed. On appeal, the order of dismissal was affirmed. (*Id.* at p. 696.)

In rationalizing the result it reached, the *Lee* court first observed that *Moradi-Shalal* had come down from the Supreme Court while the appeal was pending. (*Lee, supra,* 205 Cal.App.3d 691, 694.) With reference to the count pleaded under the Insurance Code, the court then observed, because of the termination of the third party action by means of an agreed settlement in which liability remained disputed, there had not been a *judicial* determination of the insureds' liability. As a result, *Lee* held plaintiffs' *Royal Globe*-type count did not survive *Moradi-Shalal.* (*Id.* at p. 694.)

In *Lee,* besides a *Royal Globe* count, the complaint, as here, included common law counts for both intentional and negligent infliction of emotional distress. (*Lee, supra,* 205 Cal.App.3d 691, 693.) The reviewing court,

as have we (*ante*), discounted the claim for intentional infliction of emotional distress. On the count for negligent infliction of emotional distress, based on facts far more egregious than those before us here, the court said, "[p]laintiff's negligent infliction of emotional distress count is likewise barred. The right to maintain such an action is 'necessarily . . . predicated on the existence of a duty of care and its breach. . . .' [Citation.]" (*Lee, supra*, 205 Cal.App.3d 691, 695.) In short, the *Lee* court held that no duty of care was owed a third party claimant by his or her tortfeasor's liability insurance carrier in negotiating settlement of the third party claim.

## F.

### *Plaintiffs Have Failed to State a Cause of Action for Negligent Infliction of Emotional Distress*

In a nutshell, plaintiffs' theory of duty, as they have argued it in their briefs, amounts to this: "Defendants upset us in the conduct of the settlement negotiations. Because defendants could foresee that what they were doing would upset us, they were under a duty to avoid doing so." As we have explained, because foreseeability must be discounted, such a theory is circular and assumes the key question to be decided, i.e., whether the facts pleaded import a duty of care devolving upon defendants.

The reality is that plaintiffs are seeking to persuade us to recognize a duty of care here where none has before been recognized. To be persuasive, it is incumbent upon plaintiffs to come up with reasons, including policy reasons, why this new area of liability should be recognized. This they have failed to do. In this connection, plaintiffs' reliance on *Rowland* is wholly misplaced. In *Rowland*, duty and breach were established in a personal injury context, and the significance of the decision involved a weighing of policy considerations to determine whether liability should be *excepted.* Thus, although *Rowland* expanded the duty of householders to their invitees, its significant holding, based on policy considerations, dealt with proximate cause.

More important, in this post-*Molien* era, a new factor has emerged on the scene which can be determinative in emotional distress cases based on negligence. This factor is the concept of a *direct victim*. Plaintiffs were not direct victims here because they had no preexisting relationship with defendants. Because they could not qualify as direct victims, no duty of care ever arose in their favor.

Finally, *Soto* and *Lee* held against their respective plaintiffs who had ventured upon the same gambit which plaintiffs have here. Thus, based both

upon a "direct victim" analysis, as well as upon persuasive precedent, we hold that plaintiffs have failed to plead a cause of action for negligent infliction of emotional distress.

## III.

### CAN PLAINTIFFS STATE A CAUSE OF ACTION ON THE THEORY THAT DEFENDANTS "VIOLATED" CIVIL CODE SECTION 1714?*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

### CONCLUSION

Based upon the foregoing analysis, we hold that all three assignments of error (*ante*) are without merit. More specifically, we hold that defendants' motion for judgment on the pleadings, which "performs the function of a general demurrer and is to be treated in the same fashion on appeal. . . ." (*Board of Regents* v. *Davis* (1975) 14 Cal.3d 33, 37, fn. 4 [120 Cal.Rptr. 407, 533 P.2d 1047]), was properly granted.

Finally, because plaintiffs' action, proceeding on several theories, was predicated solely on purely emotional distress arising from defendants' delay, and the reasons therefor, in offering to settle a third party claim, there was no prospect that they could ever amend their complaint to state a cause of action. Accordingly, the trial court's ruling above noted, even though it did not afford an opportunity to amend, was not an abuse of discretion. (See *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 157 [101 Cal.Rptr. 880, 496 P.2d 1248], which describes the circumstance, not present here, where not affording a chance to amend is an abuse of discretion.)

### DISPOSITION

The judgment is affirmed.

Dabney, Acting P. J., concurred.

---

*See footnote, *ante*, page 185.

TIMLIN, J.—I respectfully dissent.

## I

### INTRODUCTION

In my opinion, the majority opinion, including its disposition, is based on:

(A) the faulty *factual* premises that:

(1) plaintiffs admitted that defendant's delay in settling "was not the problem" and

(2) nothing defendants allegedly did amounts to "affirmative misconduct"; and

(B) the equally faulty *legal* premises that defendants, as a matter of law, cannot be liable to plaintiffs because:

(1) tort liability based on intentional infliction of emotional distress (IIED) and its element of outrageous conduct depends on whether there was a "special relationship," a "preexisting, contractual relationship," or a "preexisting relationship" between defendants and plaintiffs, and no such relationship existed here;

(2) tort liability for negligent infliction of emotional distress (NIED) cannot exist unless plaintiffs were "direct victims"; plaintiffs cannot be "direct victims" unless they had a "preexisting relationship" (maj. opn., *ante*, at pp. 190, 205, 206) or a "preexisting, *consensual* relationship" (maj. opn. at p. 62, italics added) with defendants; and plaintiffs here had no such relationship with defendants;

(3) "pure" emotional distress does not constitute a personal injury (e.g., maj. opn., *ante*, at pp. 190, 200) and plaintiffs here suffered only "pure" emotional distress;

(4) allowing plaintiffs' recovery of emotional distress damages based on common law tortious IIED or NIED "would restore the precise evils" referred to in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304-305 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*) (maj. opn., *ante*, at p. 195, italics deleted);

(5) because there is no judicial precedent for recovery of emotional distress damages by third party claimants from a tortfeasor's insurer based

on the insurer's tortious conduct, plaintiffs cannot state sufficient facts to allege a cause of action for IIED or NIED against defendants (e.g., maj. opn., *ante*, at p. 209);

(6) the holding in *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064 [9 Cal.Rptr.2d 615, 831 P.2d 1197] (*Burgess*) precludes plaintiffs as third party claimants from recovering damages for emotional distress from their tortfeasor's insurer for the insurer's own tortious conduct because plaintiffs' claim, unlike the claim of the plaintiffs in *Burgess*, is "nonadjunct";

(7) it is plaintiffs' burden first to establish both the existence of a present duty and a breach of that duty, and then to present public policy reasons why defendants should not be exempted from general liability for their negligent conduct, rather than it being defendants' burden to present public policy reasons to justify excepting defendants from the application of general principles of tort law, principles which are applicable to all, including insurance companies. Plaintiffs purportedly have failed to meet that burden (maj. opn., *ante*, at pp. 202-204, 206-207, 209); and

(8) foreseeability is "essentially useless" as a factor in determining whether a defendant owes a duty to a plaintiff in "purely emotional distress cases," based on *dicta* in *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398, 1401-1402, 1437 [27 Cal.Rptr.2d 894] (hereafter *Bro*), *Burgess*, and *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] (*Thing*). (Maj. opn., *ante*, at pp. 190, 201-202.)

Having now outlined those areas in which I believe the majority's most misleading statements and mischaracterizations exist, I will discuss them in more detail.

### A. The Faulty Factual Premises Upon Which the Majority Opinion Is Based

The majority contends that plaintiffs "admitted" that the approximately three-year delay[1] in settlement was not a problem, and contends that "[r]egardless of the spin which plaintiffs have put on [the facts alleged in their complaint], there is nothing finally alleged which amounts to affirmative misconduct." Both these characterizations of plaintiffs' position are incorrect.

#### 1. The Plaintiffs Did Not Admit That Defendant's Delay in Settling Was Not a Problem

A fair reading of the first amended complaint (complaint) clearly shows that the gravamen of plaintiffs' claim is that (1) defendants delayed in

---

[1]The majority erroneously states that it was a two-year delay.

making any attempts to settle plaintiffs' claim for almost three years; (2) defendants' delay and refusal to engage in good faith settlement negotiations were based in part on their use of knowingly false statements to plaintiffs concerning their insured's liability and plaintiffs' supposed preexisting conditions; and (3) defendants' motive in engaging in this affirmative conduct was their desire to keep the use of their funds for as long as possible, and to use the economic losses and emotional distress experienced by plaintiffs because of the underlying vehicular accident and the delay in settlement to obtain as advantageous a settlement for themselves as possible.

Specifically, plaintiffs alleged in their complaint that:

(1) defendants, *with knowledge that their insured had admitted he did not see plaintiffs' car, and did not apply his brakes before rear-ending them*, nonetheless *denied* and *concealed* his liability for the accident, when they knew that liability was reasonably clear;

(2) defendants *refused* to make any settlement *offer*, but instead *asserted* that plaintiffs had preexisting injuries, *despite the fact that when they made such assertions, they had no reasonable basis for believing them to be true, and, in fact, knew them to be false*;

(3) defendants knew that plaintiffs suffered severe emotional distress as a result of the fact that defendant *refused* for over three years to settle plaintiffs' claims where liability was reasonably clear and no other legitimate reason existed for not settling;

(4) almost three years after the accident, and some two years and nine months after being apprised that plaintiffs were suffering from severe financial hardship proximately caused by the accident, and that plaintiffs were on the verge of being evicted from their home because of this financial hardship, *and with no additional information regarding either liability or plaintiffs' alleged preexisting injuries*, defendants sent plaintiffs a statutory offer to compromise, pursuant to Code of Civil Procedure section 998, in the sum of $295,000, which plaintiffs accepted; and

(5) defendants "*actively undertook to deny the liability of their insured, and to deny that plaintiffs had suffered the wage loss and medical expenses and injuries that they had incurred, thereby stonewalling plaintiffs in an attempt to retain, as long as possible, for defendants' own benefit, the benefits payable to plaintiff[s] under their insured's policy.*"

Thus, as is cogently obvious from plaintiffs' complaint, defendants' protracted delay in even attempting to settle plaintiffs' claim forms an integral

part of the alleged wrong defendants committed against plaintiffs. The wrongful conduct, contrary to the majority's characterization of it, was composed of protracted delay accompanied by false statements, which statements are, in essence, circumstantial evidence of the motive behind the delay, i.e., that the reason for the delay was not because the insured was not clearly liable, or that plaintiffs had preexisting conditions, but that defendants simply wished to keep the insurer's funds in its own coffers, and wished to extract the most advantageous settlement possible by stonewalling until plaintiffs were in serious financial and emotional distress, and thus more likely to accept a lesser amount.

Thus, the complaint's allegations in toto are not limited simply to the defendants' delay in settling plaintiffs' claims, but encompass the defendants' refusal and protracted delay in not attempting to settle with plaintiffs and their wrongful reasons and ulterior purposes for such delay.

### 2. *Plaintiffs Did Allege Facts Showing That Defendants Engaged in Affirmative Misconduct*

The majority's contention that nothing alleged by plaintiffs constitutes "affirmative misconduct" is also patently incorrect. The plaintiffs' allegations of defendants' denial of the insured's liability, as well as their denial of plaintiffs' injuries and wage loss, defendants' concealment and withholding of information, their knowingly false statements to support their refusal to attempt settlement, and their refusal to make a settlement offer for years after their insured's liability was reasonably clear, constitute *active conscious conduct* by defendants.[2]

The majority also concludes that the reasons given by defendants for the delay are irrelevant. The majority's conclusion in this regard is fatally flawed; it is an established legal principle that motive may sometimes show whether an act was tortious or not, e.g., a spite fence as a private nuisance and a lawsuit as malicious prosecution. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 19, p. 80.) False reasons for one's conduct may be circumstantial evidence of an ulterior, unspoken and illicit motivation. (See, e.g., *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 39].)

The complaint's allegations do not simply or solely constitute assertions of tortious acts of omission or unintentional lapses or inaction by defendants,

---

[2]The majority also makes a cryptic and inapplicable comment that "Plaintiffs attempted to characterize defendants' advancing of this allegedly false reason to be fraud. However, in their complaint, the necessary *allegation of injurious reliance in pleading fraud is nowhere to be found."*

Plaintiffs did not attempt to plead a cause of action for fraud against defendants. They pled causes of action for intentional and negligent infliction of emotional distress. Injurious reliance on false statements is not a necessary element of such causes of action.

but state intentional tortious acts of delay and refusal by defendants for specific wrongful reasons and purposes.

B. *The Faulty Legal Premises Upon Which the Majority Opinion Is Based*

1. *There Is No Requirement That There Be a Preexisting Consensual Relationship Between Plaintiffs and Defendants at the Time Defendants Engaged in the Tortious Conduct Alleged as IIED in Order That Defendants' Conduct May Be Considered to Be Outrageous, and*

2. *There Is No Requirement That There Be a Preexisting Consensual Relationship Between Plaintiffs and Defendents at the Time Defendants Engaged in the Tortious Conduct Alleged as NIED in Order for Plaintiffs to Be the "Direct Victims" of Defendants' Tortious Conduct*

A major legal premise of the majority opinion as to both the IIED and NIED causes of action is that the plaintiffs here alleged no facts showing a "preexisting relationship" between plaintiffs and defendants. As to the NIED action, this lack of such alleged facts is converted by the majority's reliance on *Bro* and *Burgess* into its conclusion that plaintiffs therefore have failed to assert sufficient facts to show that they were the "direct victims" of any acts by defendants and, therefore, defendants owed no duty to plaintiffs. Consequently, plaintiffs are barred from recovering tort damages from defendants for NIED. (See, e.g., maj. opn., *ante*, at pp. 204-209.)

As to the IIED action, the majority seizes on *Bro*'s newly-concocted-out-of-whole-cloth concept of "preexisting *consensual* relationship," which *Bro*, an NIED case, purported to extract from *Burgess*. (*Bro*, 22 Cal.App.4th 1398, 1416: "[I]t can fairly be hypothesized from the *Burgess* pronouncements that the threshold question or first prong of our recommended test is to ask if there has been a preexisting, consensual relationship between the emotionally distressed plaintiff and the allegedly offending defendant. If not, that plaintiff is not in the class of persons whom *Molien* and *Burgess* perceive as having a protected interest in being free of the *negligent* infliction of emotional distress." [Italics added.]) The majority has become so enamored with *Bro*'s self-created concept of "preexisting *consensual* relationship" that it feels compelled to apply it to plaintiffs' IIED action here, with no logical explanation as to why this concept is or should be applicable to an *intentional* tort.[3]

Although the majority, in its discussion of plaintiffs' IIED action, does not refer to the classification of "direct victims" as that phrase is used in its

---

[3]As further discussed in the text of this dissenting opinion, the "preexisting relationship" idea has been developed by the Supreme Court as one of *three* independent analytic factors to

analysis of the existence of a viable NIED action, it does add "preexisting contractual relationship" as a controlling analytic factor in determining the existence of outrageous conduct, which is an element of an IIED action.

According to the majority, in an IIED action, this allegation of a "preexisting relationship" is necessary to establish that the plaintiff had the kind of "expectation" which would lead a court to conclude that the defendant's behavior was "outrageous," the majority here having held that "the *same behavior* by respective defendants can be outrageous where there is privity and not where there is none."[4]

Further, according to the majority, in an IIED action a plaintiff must establish that the defendant *breached* a duty *owed* to the plaintiff, based on its conclusion that the existence of a "special" or "preexisting" relationship is linked to the element of breach. (Italics in original omitted and italics added: "whereas the *duty* to refrain from intentionally inflicting emotional distress *transcended* the special relationship, that relationship was *decisive* in finding *breach*"; "In sum, while the law in the first instance does not require a preexisting relationship between the parties as a precondition for stating a cause of action for intentional infliction of emotional distress, there are a group of cases, of which *Fletcher* [v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 (89 Cal.Rptr. 78, 47 A.L.R.3d 286), hereafter *Fletcher*] and *Little* [v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451 (136 Cal.Rptr. 653)] are illustrative, where finding a *breach of duty* to refrain from intentionally inflicting emotional distress *derives primarily from the fact of a preexisting, contractual (special) relationship.*"

Although the majority takes great pains to state that as to an IIED action, a plaintiff need not allege a preexisting relationship to establish a right to be

---

determine if a defendant in a cause of action for *negligent* infliction of emotional distress had a *duty* to the plaintiff as a direct victim. In an action for an *intentional* tort, the defendant's *intentional* invasion of the plaintiff's legally protected right serves as the "relationship"—a battery committed by a stranger is still a tort, despite the lack of any preexisting relationship, consensual or otherwise, between batterer and victim.

[4]Actually, the majority has tried to obscure the fact that it is making a "preexisting relationship" the dominant test as to whether outrageous conduct has been sufficiently alleged in a cause of action for IIED. At one point, it states that "we emphasize that *there is no requirement of a special or preexisting relationship between the parties as a precondition to stating a cause of action on this theory.*"

However, it then states that the "touchstone of an actionable claim for intentional infliction of emotional distress is the outrageous nature of the defendant's conduct . . ." . It then makes it clear that, because plaintiffs who do not have a "preexisting relationship" with a defendant have "lesser expectations," conduct which "disappoints" such "lesser expectations" is not "outrageous." The most intelligible articulation of this position is the majority's pronouncement that "The plaintiffs [first party claimants] there [in *Little* and *Fletcher*] had the understandable expectations of *insureds.* Here, there was no such relationship and, without the presence of such relationship, plaintiffs' allegations do not disclose behavior which arises to the level of outrage necessary to impose liability . . . ." (Italics added.)

free of outrageous conduct by a defendant (implying a correlative *duty* by defendant not to engage in such conduct), its requirement that such be alleged to establish a breach of such duty actually limits the duty to refrain from outrageous conduct to a certain class of persons, i.e., those who had a preexisting relationship to plaintiffs.

In my opinion, the majority, by its application of the interchangeable concepts of preexisting special relationship or preexisting consensual relationship or preexisting contractual relationship to certain elements of a tort action for NIED, and to certain elements of a tort action for IIED, in effect has blurred, if not eliminated, such separate causes of action. The majority would require a person claiming "purely emotional distress damages" caused by another's conduct to (1) allege in a NIED action that she or he is a direct victim, i.e., had a preexisting consensual relationship with the defendant as defined in *Bro*, and (2) allege in an IIED action a prior existing relationship as either an aspect of breach (in my view really duty) in order to sufficiently allege the outrageousness of the misconduct. This, of course, flies in the face of the long-standing principles behind liability for intentional torts and liability for negligence, and appears to be a transparent attempt to require privity of contract as a prerequisite for *tort* liability, an attempt clearly at odds with long-standing legislative and judicial trends. (See 3 Witkin, Summary of Cal. Law, *supra*, Sales, §§ 95, 106, pp. 79-80, 89.)

The majority also muddies basic tort law in two ways. First, it contends that "[i]n *Little* and *Fletcher*, at the heart of our holding nonpayment of policy benefits to be outrageous was the presence of a preexisting, contractual relationship *under which arose an affirmative duty to pay those benefits.*" These cases do not stand for any such proposition, and the majority does not (and cannot) cite to, nor quote, any language which states that the outrageousness of a given behavior is dependent on the existence of a prior contractual relationship between the plaintiff and defendant.

While it is true that the author of *Fletcher*, Justice Kaufman, noted that the relationship between the parties was significant in determining whether liability for IIED should be imposed (*Fletcher*, *supra*, 10 Cal.App.3d at p. 403), the authorities he cited for that proposition[5] did *not* relate to solely *contractual* relationships between plaintiffs and defendants.

For example, in *Alcorn v. Anbro Engineering, Inc.*, *supra*, 2 Cal.3d 493, the plaintiff was the employee of the defendants. While the relationship of

---

[5]Prosser, Law of Torts (3d ed. 1964) chapter 2, section 11, page 49; Harper and James, The Law of Torts (1956) section 9, pages 666-667; Restatement Second of Torts, section 46, comment e; Magruder, *Mental and Emotional Disturbance in the Law of Torts* (1936) 49 Harv. L.Rev. 1033, 1051-1063; Prosser, *Insult and Outrage* (1956) 44 Cal.L.Rev. 40, 47; Annotation, 15 A.L.R.2d 108, 158-163; and *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, footnote 2 [86 Cal.Rptr. 8, 468 P.2d 216].

employer and employee may be considered contractual in nature, this was not the aspect of the relationship which the court in *Alcorn* mentioned; instead the court considered the fact that defendants "[stood] in a position or relation of authority over plaintiff," and were "aware of his particular susceptibility to emotional distress." (2 Cal.3d at p. 498, fns. omitted.)

So, too, comment e of section 46 of the Restatement Second of Torts, also relied upon in *Fletcher*, makes no reference to *contractual* relationships. Instead, it states: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. . . . In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position. . . ."[6] It is clear that the common factor uniting these varied categories of actors is not their potential or existing *contractual* relationships with others, but their positions of power.

It is significant that Justice Kaufman also remarked, in connection with the importance of the relationship between the parties, that "Additionally, the special obligation of public utilities and *other enterprises affected with the public interest* has been noted as significant in the imposition of liability upon such defendants *even in the absence of outrageous conduct*, apparently upon a policy basis of encouraging fair treatment of the public whom the enterprises serve. [Citations]." (*Fletcher, supra,* 10 Cal.App.3d at p. 403, italics added.) Given the position of automobile liability insurers in today's society and economy, as discussed in more detail later in this dissent, the majority's insistence on essentially exempting such insurers from liability for IIED as to all members of the general public with whom they may be called to interact is illogical, unreasonable, and unfair.[7]

---

[6]This statement is repeated in Prosser, *Insult and Outrage, supra,* 44 Cal.L.Rev. 40, 47: "[T]he extreme and outrageous nature of the conduct arises not so much from what is done as from the abuse by the defendant of some relation with the plaintff, or some position which gives him acutal or apparent authority over the plaintiff, or power to damage his interests." Thus, among Prosser's examples of defendants found liable for outrageous conduct were members of a mob who threatened to lynch or beat up a plaintiff, and police officers who falsely told a woman that her husband and child had been hospitalized in order to lure her into confinement for lunacy. It is clear that these defendants had no contractual relationships with the plaintiffs; instead, they abused positions of power, and on that basis were liable for outrageous conduct.

[7]This special obligation of those charged with the public interest was noted in Magruder, *Mental and Emotional Disturbance in the Law of Torts, supra,* 49 Harv.L.Rev. at pages 1051 to 1052, one of the authorities relied upon in *Fletcher.*

In his law review article, Magruder discussed a case in which an innkeeper was held liable for the humiliation experienced by two guests after he broke into their room and accused them of being unmarried and using the room for an improper purpose. In that case, the court

Second, the majority mistakenly implies that Witkin, in commenting on the cases involving liability for IIED, specifically referred to the absence of privity in those cases where no liability was found, and the presence of privity where liability did exist. ("According to Witkin, the ratio decidendi in each of these *first-party cases*, leading to a finding that nonpayment of benefits due the insureds under the several policies was outrageous, derived from *the relationship of insured and insurer*," and "To emphasize that this special relationship was the crux of *finding breach* in these decisions, Witkin proceeds immediately thereafter to discuss cases where the plaintiffs' claims for intentional infliction of emotional distress were denied *for want of privity*.") I can only encourage the readers of this opinion to read the noted sections in Witkin for themselves; Witkin makes no mention of the presence or absence of privity, and never states that it was the relationship of insured and insurer which made the insurer's conduct outrageous.

### 3. *Emotional Distress, Without Accompanying Physical Injury, Is Legally Compensable as a Personal Injury*

The majority asserts that plaintiffs assume that "all foreseeable emotional distress constitutes an injury" and that such an assumption is insupportable as a matter of logic and precedent. According to the majority, in order to show the existence of an injury subject to the provisions of Civil Code section 1714, the plaintiffs must show affirmatively that they were owed a duty and that it was breached, and this they failed to do.

The majority cites no authority for the proposition that injury is defined by duty and breach. If I, through my own negligence, slip and fall and hurt my back, I have sustained an injury; the injury has nothing to do with whether anyone owed me a duty and breached it. Duty and breach relate to the question whether the defendant will be held liable to the plaintiff, i.e., whether the defendant will have to compensate plaintiff for the harm suffered. Duty and breach do not define whether the plaintiff has suffered an injury.

---

considered the fact that the innkeeper "carrying on a business of a public nature, is by law charged with the duty of extending to his guests 'respectful and decent treatment', and of refraining from wilful conduct toward them that would interfere with their comfort or humiliate and distress them. In other words, here is a situation where for reasons of policy and because of the relationship of the parties, the law gives the plaintiff redress for mental distress and humiliation caused by the defendant's insulting conduct. The interest in mental tranquility is being directly and independently protected here, as in the analogous carrier-passenger relationship, where many cases have allowed passengers to recover for insulting conduct of the carrier's servants. . . . *Incidentally, it may be noted that this liability for insulting conduct in the carrier and innkeeper cases is not adequately explained as an instance of parasitic damages upon a cause of action for breach of contract.* In [the innkeeper case], liability was imposed not only upon the hotel corporation but upon the wrongdoing agent as well, though the latter, of course, was not a party to the innkeeper-patron relation." (Fns. omitted, italics added.)

Further, the majority also implies that emotional distress alone, without any accompanying *physical* injury, is not a form of personal injury which is legally compensable. The following quote from *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] debunks this suggestion:

"Amici curiae first assert that, under California case law, the existence of a physical injury is a predicate to recovering damages for emotional distress in a negligence action unless the action involves 'bystander' recovery (e.g., *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 86, 771 P.2d 814] [hereafter *Thing*]) or [unless] there is a 'preexisting relationship' between the plaintiff and defendant (e.g., *Marlene F.* [v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989)] *supra*, 48 Cal.3d 583) which creates a duty to the plaintiff, neither of which is implicated here. This assertion is plainly without merit. [¶] Significantly, we recently reaffirmed the principle that, in California, 'damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact . . . .' (*Burgess, supra*, 2 Cal.4th at p. 1074.) We held that 'physical injury is not a prerequisite for recovering damages for *serious* emotional distress,' especially where 'there exists a "guarantee of genuineness in the circumstances of the case." [Citation.]' (*Id.*, at p. 1079.) [¶] Contrary to amici curiae's assertions, this principle has never been restricted to cases involving bystanders or preexisting relationships. Notably, amici curiae cite no authority even suggesting such a limitation." (6 Cal.4th at p. 986.)

Emotional distress without accompanying physical injury, as alleged by plaintiffs here, is, in fact, a legally compensable "personal injury" (see, e.g., 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 1403, 1409, 1410, pp. 874, 879, 880) in cases in which a plaintiff's serious emotional distress was caused by a defendant's breach of a legal duty owed to the plaintiff.

### 4. *The Holding in Moradi-Shalal Does Not Preclude Third Party Claimants From Suing Insurers for IIED or NIED in a Proper Case*

The majority's final method of attempting to validate its position that insurers can never be held liable for IIED is to rely on *Moradi-Shalal* for the proposition that "both before and after *Moradi-Shalal*, there was not and is not a cause of action for intentional infliction of emotional distress, where based only on a delay in offering to settle, even though the insurer's behavior may have mirrored those settlement practices defined as unfair by the Insurance Code."

However, the court in *Moradi-Shalal* was not dealing with the issue of whether insurers could *ever* owe *any* kind of a common law duty to third

party claimants; instead, it was dealing with the holding in *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] (*Royal Globe*) that third party claimants could maintain a private, statutorily based cause of action against insurers for violations of the Insurance Code. (*Moradi-Shalal*, 46 Cal.3d at p. 304.) And, in overruling *Royal Globe*, the court in *Moradi-Shalal*, after cautioning that its decision was not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code, specifically stated that ". . . the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, infliction of emotional distress, and (as to the insured) either breach of contract or breach of the implied covenant of good faith and fair dealing. Punitive damages may be available in actions not arising from contract, where fraud, oppression or malice is proved. (See Civ. Code, § 3294.) In addition, prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. (See *id.*, § 3291.)" (*Moradi-Shalal*, 46 Cal.3d at pp. 304-305.)

The majority opinion seeks to avoid the clear import of the above-noted language, to wit, that *Moradi-Shalal* specifically anticipated that its overruling of *Royal Globe* did not preclude third party claimants from maintaining any other kinds of civil action against insurers, by characterizing it as "reassuring" (maj. opn., *ante*, at p. 189) and by then quoting *Lee* v. *Travelers Companies* (1988) 205 Cal.App.3d 691 [252 Cal.Rptr. 468] (*Lee*): " '. . . it is well settled that "[t]he failure to accept an offer of settlement *or* the violation of statutory duties under the Insurance Code section 790.03 does not itself constitute the type of outrageous conduct which will support a cause of action for intentional infliction of emotional distress. [Citations.]" ' (*Lee, supra*, 205 Cal.App.3d 691, 694-695.)" The majority then "construe[s]" *Lee* to mean (but, notably not to have *held*) that a claimant can *never* state a cause of action for IIED based on an insurer's delay in offering to settle, "even though the insurer's behavior may have mirrored those settlement practices defined as unfair by the Insurance Code."

However, the majority opinion has pointedly ignored the language in Lee which immediately follows the portion quoted by the majority opinion, to wit: "Since plaintiffs have explicitly premised their intentional infliction of emotional distress count upon defendants' purported *failure to 'fulfill*[] *their statutory duties* . . .' and have not alleged with specificity any other acts '. . . so extreme as to exceed all bounds of that usually tolerated in a civilized community' [citations], the trial court's ruling [sustaining defendants' demurrer without leave to amend] on that count was also correct." (205 Cal.App.3d at p. 695, italics added.)

In other words, *Lee* did not hold that a third party claimant could never state a cause of action based on "behavior" by the insurer which "mirrored those settlement practices defined as unfair by the Insurance Code." Instead, *Lee* held that it was not sufficient, for a cause of action for IIED, to simply allege a failure to fulfill statutory duties; instead, a plaintiff must specifically allege acts by the insurer which are outrageous. For example, in *Doctors' Co. Ins. Services* v. *Superior Court* (1990) 225 Cal.App.3d 1284, 1292 [275 Cal.Rptr. 674], the appellate court specifically commented, based on the opinion in *Lee*, that "a cause of action for intentional infliction of emotional distress may lie where an insurer sends harassing or deceptive letters in an effort to induce a *third party claimant* to settle. [Citations.]"

To reiterate, *Moradi-Shalal* did no more than deny to private plaintiffs a statutorily based, unfair claims practices cause of action pursuant to the Unfair Insurance Practices Act (UIPA). My view that the "reassuring" language in *Moradi-Shalal* applies to both IIED and NIED actions is generally supported by the court in *Manufacturers Life Ins. Co.* v. *Superior Court* (1994) 27 Cal.App.4th 67 [33 Cal.Rptr.2d 424] review granted October 13, 1994 (S031022), which stated:

"While rejecting the attempt to predicate new rights of action on the UIPA, the court in *Moradi-Shalal* emphasized that existing remedies were unaffected by the Act. It 'urge[d] the Insurance Commissioner *and the courts* to continue to enforce the *laws* forbidding [unlawful insurance] practices to the full extent consistent with our opinion,' and declared that 'the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, infliction of emotional distress, and (as to the insured) either breach of contract or breach of the implied covenant of good faith and fair dealing.' (*Id.* at pp. 304-305, italics added.)

". . . . . . . . . . . . . . . . . . . . . . .

"We understand the reference to the common law in *Moradi-Shalal* to rest on the premise that the cause of action asserted there—unfair claims practices—had no statutory basis outside of the UIPA. Since the UIPA itself afforded no right of action, the plaintiff was relegated to such common law claims as might be available.

"*Moradi-Shalal* marks a return to the fundamental principle that the UIPA, like all statutes, is to be applied according to its terms. Its language neither creates new private rights *nor destroys old ones*. This was the view of Justice Richardson, whose dissent in *Royal Globe*, [1979] 23 Cal.3d [880] at pp. 895-898, was heavily cited in *Moradi-Shalal*. (46 Cal.3d at pp. 294-296.) He

wrote that section 790.09 'preserves *any* preexisting civil or criminal liability which the insurer might face under *other statutory or decisional law.*' (*Royal Globe, supra,* 23 Cal.3d at p. 893, some italics added; see *id.* at p. 896.) Similarly, the court in *Shernoff* v. *Superior Court* [1975] 44 Cal.App.3d 406, 409 [118 Cal.Rptr. 680], acknowledges that section 790.09 'expressly reserves to litigants *all* civil and criminal remedies against persons who have violated the law.' (Italics added.) These authorities are consistent with the language of the statute and with the *unanimous* view of courts elsewhere." (27 Cal.App.4th at pp. 85-86.)

Here, plaintiffs in their amended complaint eliminated earlier allegations that defendants had failed to fulfill their statutory duties under Insurance Code section 790.03. *Moradi-Shalal* precluded such allegations. Plaintiffs instead alleged specific conduct as a basis for their common law actions, as noted earlier, which conduct, if true, was sufficiently extreme to constitute the basis for a cause of action for IIED. (See pp. 231-235, *post,* concluding that conduct which would be considered outrageous if directed by an insurer at an insured is also outrageous if directed by an insurer at a third party claimant.)

Thus, contrary to the majority's assertions, all that is required to state a prima facie case of IIED are allegations of: " '(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the possibility of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress. [Citations.]' " (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58].) And, also contrary to the majority's assertion, there need not be privity or a preexisting contractual relationship between the defendant and plaintiff before (1) the defendant's conduct can be characterized as outrageous;[8] or (2) the defendant can be found to have breached its duty owed to the plaintiff. Thus, plaintiffs here have clearly alleged every element necessary to state a cause of action for IIED.

   5.   *The Lack of Case Law Directly on Point Does Not Preclude Third Party Claimants From Suing for Damages for Emotional Distress Inflicted Either Negligently or Intentionally by Insurers*

First, the majority makes much of the fact that plaintiffs have not cited any opinion in which a claimant's cause of action for NIED against an

---

[8]"Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him [or her] power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; *or* (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. [Citations.]" (*Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 946, italics added.)

insurer has been recognized. (Maj. opn., *ante*, at p. 189.) The fact that plaintiffs have not cited any such previously published opinions is irrelevant: "The concept that there are no causes of action except those that have been recognized by precedent, assumed at some point in the common law, was not accepted generally at early common law nor is it accepted today." (*Rosefield* v. *Rosefield* (1963) 221 Cal.App.2d 431, 435 [34 Cal.Rptr. 479]; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 16, pp. 75-77.)

If such were not the rule, there would not be causes of action for product liability, for violation of the right of privacy, for interference with prospective business advantages, or for injury to an unborn child. (See cases cited at 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 16 at p. 77.) Here, plaintiffs are not asking us to create a new cause of action, because a cause of action for NIED has existed for some time now. Instead, they are simply asking that this court apply the same principles of tort liability to automobile liability insurance companies in their relationship with claimants as are applied to other tortfeasors.

Second, the majority claims that there has been a "uniform unwillingness of courts up to now to create a common-law duty to settle[9] running in favor of third parties," which supposed unwillingness it attributes to the "conflict of interest" implicit in "any undertaking to characterize the legally adverse relationship between insureds and third parties as a predicate for imposing a duty to settle . . . ."

Remarkably, the majority itself cites no cases which have held, as a matter of law, that third party claimants *cannot* maintain an ordinary, common law cause of action for IIED or NIED against insurers if they allege the proper elements. The majority does assert that there are cases "where third parties have failed in their efforts to recover damages from their tortfeasor's insurance company for negligent infliction of emotional distress," (maj. opn., *ante*, at p. 207) and cites *Soto* v. *Royal Globe Ins. Co.* (1986) 184 Cal.App.3d

---

[9]The majority persists in characterizing the duty here involved as the duty to settle. I have never opined that an insurer must settle every claim by a claimant. That would be a ridiculous position.

Upon the involvement of an insured in an accident with a person who incurs injuries and/or property damage, resulting in that person making a claim against the insurer, a special relationship begins to exist between the claimant and the insurer at the time the claim is made creating a duty by the insurer and claimant *to attempt to resolve the claim without unreasonable delay, in fairness and good faith.* This special relationship is not adversarial in nature but is one of openness, candor and understanding. It only becomes adversarial when one or both parties act unreasonably and unfairly toward the other during the attempt to settle, e.g., when there has been unreasonable delay or arbitrary refusal by the insurer to resolve the claim, particularly when the insured's liability for the accident and the claimant's injuries and losses are reasonably certain.

420 [229 Cal.Rptr. 192] (maj. opn., *ante*, at pp. 207-208) and *Lee*, *supra*, 205 Cal.App.3d 691. (Maj. opn. at pp. 208-209.)

The majority's reliance on these two cases for the proposition that third party claimants can *never* successfully state a cause of action for NIED against an insurer is misplaced. *Lee*'s inapplicability for such a proposition has already been discussed. (See pp. 221-222, *ante*.) As for *Soto*, it was a pre-*Molien* case, and thus the majority's attempt to use its holding as post-*Molien* authority lacks persuasive weight.

Moreover, in *Soto*, this court held that the family members of an injured employee could not state a cause of action for NIED against an insurer who delayed paying the employee's claim for workers' compensation benefits, but not because of lack of "privity" or a "preexisting relationship" between the insurer and the plaintiff family members.[10]

Moreover, the majority has not cited any cases to support its claim that there is a "uniform unwillingness" "to create a common-law duty" on the

---

[10]Although the majority here does not seek to premise its reliance on *Soto* on any of the three analytical bases for *Soto*'s holding, but instead solely on *Soto*'s mere existence, I think it worthwhile to point out that the three bases upon which *Soto* grounded its holding simply do not hold up upon careful analysis.

As to the first basis, the *Soto* court made a point of discrediting the plaintiffs' cause of action for NIED by reference to *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] (*Molien*), concluding that "[o]n the facts alleged in the case here, it would be a massive contortion of logic to describe defendant insurer's action in delaying payment of plaintiff employee's WCAB award as '*directed*' at the plaintiff family members [citation]. Accordingly, we hold that no cause of action was alleged by these plaintiffs under the *Molien* theory." (184 Cal.App.3d at p. 432, italics added.)

However, the determinative issue in *Molien* was *not* that the defendant's negligent conduct was "*directed*" at the plaintiff (whose wife was mistakenly diagnosed as having a sexually-transmitted disease), but that *the risk of harm to the plaintiff was reasonably foreseeable to defendant.* (*Molien*, *supra*, 27 Cal.3d at p. 923.) As the court in *Molien* explained: "It is easily predictable that an erroneous diagnosis of syphilis and its probable source would produce marital discord and resultant emotional distress to a married patient's spouse. . . . [¶] We thus agree with plaintiff that the alleged tortious conduct of defendant was directed to him as well as to his wife. Because the risk of harm to him was reasonably foreseeable we hold, in negligence parlance, that under these circumstances defendants owed plaintiff a duty to exercise due care in diagnosing the physical condition of his wife." (*Id.* at p. 923.)

As to the second basis, the court in *Soto* concluded that, according to *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1], there were two requirements for stating a cause of action for NIED: (1) foreseeability of an emotional shock resulting from (2) an "abnormal event." (184 Cal.App.3d at p. 433.) It then concluded, as a matter of law, that mere failure to timely pay workers' compensation benefits was not "an abnormal event." (*Ibid.*)

However, in my opinion, the court in *Soto* simply read more than was warranted into the meaning of "abnormal event," as that term was used by the court in *Ochoa*. In *Ochoa*, the court used the term "abnormal event" only once, in its discussion of whether a "sudden

part of insurers to settle, let alone to create the duty actually at issue here: the duty to deal honestly and in good faith during settlement negotiations with third party claimants, and to attempt to come to a fair settlement within a reasonable amount of time after the insured's liability has become reasonably clear and the claimants' damages are reasonably ascertainable.

Instead, the majority concentrates on cases in which it was held that third parties lacked standing to sue the tortfeasor's insurers for breach of the implied *contractual* covenant of good faith and fair dealing, and ignores the fact that "Privity of contract [a form of preexisting relationship] is not

occurrence" was a necessary requirement for recovery by *a bystander* who suffers emotional distress upon witnessing negligently caused injury to a loved one. (39 Cal.3d at pp. 167-168.) The *Ochoa* court concluded that the requirement of a "sudden occurrence" was an unwarranted restriction on the *Dillon* guidelines, because it limited liability "when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event, . . ." (*Id.* at p. 168.)

The court in *Ochoa* never defined "abnormal event," but it is apparent, when the opinion is read as a whole, that the term "abnormal event" simply meant some *tortious* conduct, or tortious failure to act, by the defendant, since *Ochoa* held that recovery would be permitted when the shock suffered flowed from the "observation of the defendant's conduct and the [loved one's] injury and contemporaneous awareness [that] the defendant's conduct or lack thereof is causing harm to the [loved one]," regardless of whether, at the time the conduct was observed, the plaintiff/bystander was aware of the tortious nature of the conduct. (39 Cal.3d at p. 170.)

Thus, the second basis for the holding in *Soto* is analytically wrong, and, in any event, inapplicable here, for the plaintiffs here are not "bystanders," as were the plaintiffs in *Soto*; the plaintiff family members in *Soto* based their cause of action on the insurer's failure to pay their husband/father's claim; the plaintiffs here have based their NIED cause of action on the insurer's failure to pay *their own* claim.

The third basis is that *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754 [136 Cal.Rptr. 815] correctly held that California law did not warrant extending recovery for emotional distress damages in cases involving negligence without bad faith. (184 Cal.App.3d at pp. 433-434.) The problem with *Soto*'s reliance on *Quezada* becomes apparent when the *entire* quote from *Quezada* is read, as opposed to the edited quote contained in *Soto*. The quote, in its entirety, states:

"To the extent that the court in *Jarchow* purported to *extend the doctrine of the foregoing cases* [cases in which recovery for 'emotional suffering damages' was limited to 'cases involving either physical impact and injury to plaintiff or intentional wrongdoing by defendant,'] to allow recovery for emotional suffering damages in cases involving negligence without bad faith *and without physical injury*, the extension was unwarranted by California law, *for all prior cases contain some element of intentional or affirmative wrongdoing by defendant.*" (*Quezada* v. *Hart, supra,* 67 Cal.App.3d at p. 762, italics added to those portions of *Quezada* omitted by the court in *Soto, supra,* 184 Cal.App.3d at p. 434.)

In other words, *Quezada*, a pre-*Molien* case, held that a plaintiff could not recover for emotional distress damages in a negligence case unless the plaintiff could plead and prove *either* bad faith *or physical injury*. By relying on *Soto*, the majority ignores the later Supreme Court opinion in *Molien* which disposed of the requirement that a plaintiff must plead and prove physical injury as a prerequisite of recovery for NIED. (*Molien, supra,* 27 Cal.3d at pp. 929-930.) Thus, *Soto*'s reliance upon *Quezada* was misplaced, and so too is the majority's reliance on *Soto*.

necessary to establish the existence of a duty to exercise ordinary care not to injure another, but *such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty.*" (*Merrill* v. *Buck* (1962) 58 Cal.2d 552, 561-562 [25 Cal.Rptr. 456, 375 P.2d 304], italics added; see also *Lacher* v. *Superior Court* (*Southwest Diversified, Inc.*) (1991) 230 Cal.App.3d 1038, 1047-1048 [281 Cal.Rptr. 640]; *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 684-685 [81 Cal.Rptr. 519, 39 A.L.R.3d 173].)

It is rather obvious that by entering into policies of automobile collision liability insurance, insurers are voluntarily assuming a duty to the insured to exercise due care in handling claims by such insured under such policies, just as it is obvious that they are also entering into a potential relationship with yet-to-be-identified claimants who may be injured by their insureds, which potential relationship can and will ripen into a legally significant relationship once the insurer is notified that its insured has injured a particular claimant.

Finally, it is also apparent (despite the holding in *Moradi-Shalal* that such claimants may not bring a private civil action pursuant to Insurance Code section 790.03) that both case law and Civil Code section 1714 impose a duty on insurers to use due care, and to act in good faith when handling third parties' claims. (See, e.g., *Moradi-Shalal*, *supra*, 46 Cal.3d at pp. 304-305; *Burgess*, *supra*, 2 Cal.4th at p. 1079, quoting Civ. Code, § 1714, subd. (a) [" 'Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself.' "].)

Therefore, the lack of case law *directly* on point in no way precludes plaintiffs here from bringing a common law, tort-based action against defendants. Additionally, the majority's unsupported assertions to the contrary, there are no cases evidencing any judicial unwillingness to require insurers to exercise the same kind of care in handling their affairs as is required of all other businesses and individuals.

6. *The Majority's Distinction Between "Adjunct" and "Nonadjunct" Claims for Emotional Distress Damages Is Meaningless*

The majority, in connection with its attempt to explain why automobile liability insurers are not subject to the general rule of liability stated in Civil Code section 1714, and to buttress its assertion that the emotional distress experienced by third party claimants when such insurers refuse to conduct

settlement negotiations in good faith is not an injury, characterizes the claims of such claimants as "nonadjunct" in contrast with the "adjunct" *claims* of plaintiffs who are entitled to recover.[11]

The majority never defines the terms "adjunct" and "nonadjunct" as used to describe claims for emotional distress, and cites no authority for its use of these terms. However, the concept of "adjunct" and "nonadjunct" claims or "adjunct" and "nonadjunct" damages was first used by the author of the majority opinion here, in the earlier opinion he authored in *Bro, supra*, 22 Cal.App.4th at pages 1417, 1420-1437 and 1444. In *Bro*, the terms were apparently defined as follows: "These classifications involve whether such claims [for emotional distress] damages were asserted in addition to *other* claims for damages (thus, adjunct) or whether such claims stood alone (thus, nonadjunct)." (22 Cal.App.4th at p. 1417.)

The opinion in *Bro* made an abbreviated attempt to legitimate its use of the adjunct/nonadjunct distinction as a basis for denying recovery to plaintiffs with only "nonadjunct" claims by asserting that in *Burgess*, "The Supreme Court ruled that the mother was not a bystander but 'may state a claim for [adjunct] damages for serious emotional distress arising from the negligent delivery of her child.' (*Burgess, supra*, 2 Cal.4th 1064, 1085.)" (*Bro, supra*, 22 Cal.App.4th at p. 1414.) The *Bro* opinion's use of brackets around the word "adjunct" is, of course, the clue to the sincerity of this attempt to coin a new classification of a third party claim, based on a newly minted damage categorization being entitled "adjunct" or "nonadjunct." The court in *Burgess*, of course, never mentioned adjunct or nonadjunct claims.

Essentially what the court did in *Bro*, and what the majority attempts to do here as well, is to create a new rule (lacking any rational basis) that only when a plaintiff's claim for emotional distress is "adjunct" to some other claim, e.g., a claim for medical malpractice (even though both claims are based on one primary right, i.e., the right not to be harmed by the negligent conduct of another), will the plaintiff be allowed to recover.[12] This is simply an effort to return to the days when plaintiffs could not recover for emotional distress which was unaccompanied by physical injury. No appellate court, including our Supreme Court, has indicated the slightest interest in reinstating such a requirement.

---

[11]The majority also refers to ". . . (adjunct) damages."

[12]Instead of giving any reason for this rule, the court in *Bro* simply purported to glean this principle from its analysis of the various cases it catalogued. (22 Cal.App.4th at pp. 1420-1437.) However, none of the cases so catalogued involved any decision on the issue of "adjunct" versus "nonadjunct" claims.

7. *It Is Defendants' Burden to Point to Public Policy Reasons Which Justify Exempting Them From Liability for Their Negligent Conduct*

The majority first urges that the holding in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*) upon which plaintiffs rely, is irrelevant here because (1) *Rowland* involved a "personal (physical) injury" (and plaintiffs here suffered no such injury); and (2) *Rowland* had nothing to do with the negligent infliction of emotional distress (and the case here does). (Maj. opn., *ante*, at pp. 198-200.)

As discussed above, plaintiffs here did suffer an injury. Furthermore, *Rowland*, *supra*, 69 Cal.2d 108 held, at pages 112-113, that a person is liable for injuries caused by his failure to exercise ordinary care in the circumstances, and, unless there is a statutory exception declaring an exception to the fundamental principle stated in section 1714, no other exception should be made unless the latter is clearly supported by public policy. This general rule applies to *all* cases involving injury caused by another's negligent conduct, not simply to cases involving invitees of occupiers of property or "physical" injuries such as cut hands.

The majority opinion also states that it is up to plaintiffs to point to public policy reasons which justify imposing liability on insurers for their negligent conduct committed against third party claimants while handling the latter's claims. (Maj. opn., *ante*, at pp. 202, 209.)

However, as analyzed in more detail later, it is *defendants'* responsibility to demonstrate a statutory exception or a compelling public policy reason for *exempting* insurers from liability to third party claimants for their negligent acts. The defendants, and the majority, have failed to do so.

Although the majority has excused itself from applying any of the public policy factors which might favor exempting defendants here from liability to plaintiffs for their allegedly negligent acts, I accept the majority's invitation to consider and apply the *Rowland* analytic factors to the factual allegations of this case. As set forth later in this dissenting opinion, I conclude that no policy reason exists for exempting insurers from liability to third party claimants injured by an insurer's wrongful acts. To the contrary, the application of such factors supports the existence of a duty by defendants to exercise ordinary care in handling plaintiffs' claims.

8. *Foreseeability Continues to Be One of Several Factors Applicable to a Consideration of Whether a Defendant Should Be Excepted for Policy Reasons From Its General Liability to a Plaintiff for Its Negligence Even Though Plaintiff Is Primarily Seeking Damages for Emotional Distress*

The majority also asserts that foreseeability is "essentially useless" as a factor in determining whether a defendant owes a duty to a plaintiff in "purely emotional distress cases," based on *dicta* in *Bro, supra,* 22 Cal.App.4th at pages 1401-1402, 1437, *Burgess,* and *Thing.* (Maj. opn., *ante,* at pp. 190, 201-202.) This assertion is patently wrong. In *Burgess,* our Supreme Court made a comment that " 'foreseeability of the injury *alone* is not a useful "guideline" or a meaningful restriction on the scope of [a NIED action]' " (*Burgess, supra,* 2 Cal.4th at p. 1074, quoting *Thing, supra,* 48 Cal.3d at p. 663, italics added), but it certainly did not state that foreseeability was useless in determining the issue of duty. In fact, in the post-*Burgess* opinion of *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207], Justice Panelli, writing for a six-justice majority, stated: "In this [area, i.e., the area of tort law concerning a defendant's duty to take affirmative action to control the wrongful acts of third parties], as in other areas of tort law, *foreseeability is a crucial factor in determining the existence of duty.* [Citations.]" (6 Cal.4th at pp. 676-677, italics added; see also *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] [*Tarasoff*].)

Having laid out the major factual and legal premises upon which the majority's analysis is based and my general response to the fallaciousness of such, I now examine in more critical detail the erroneous reasoning in which the majority engages by reason of its assuming the correctness of these premises to justify its affirmance of the trial court's order.

II

DISCUSSION

A. *Plaintiffs' Cause of Action for IIED*

The majority opinion uses a melange of different arguments to discredit plaintiffs' cause of action for IIED. After this melange is separated, it is apparent that none of its component points is persuasive.

### 1. *Plaintiffs Have Alleged Sufficient Facts to Show the Outrageous Conduct Necessary to Support a Cause of Action for IIED*

##### a. *The Facts Alleged Here, Which Are Substantially Similar to Facts Found in Fletcher and Little to Be Sufficient to Constitute "Outrageous Conduct" by an Insurer, Cannot Be Distinguished on the Ground That Plaintiffs Here Supposedly Had No "Preexisting Relationship" or Privity of Contract With Defendants.*

The majority opinion asserts that the facts alleged by plaintiffs do not constitute the kind of outrageous conduct necessary to support a cause of action for IIED, cursorily dismissing plaintiffs' reliance on *Fletcher* and *Little* by observing that in both cases the plaintiffs and defendants had a "preexisting, contractual relationship" under which "*an affirmative duty to pay*" policy benefits arose. In other words, the majority attempts to distinguish *Fletcher* and *Little* because they were *first party*, breach of contract cases. However, what the majority fails to deal with is that the plaintiffs in both *Fletcher* and *Little also* sued for IIED, a *tort* cause of action as to which the first party/third party, "preexisting, contractual relationship" distinction is irrelevant.

The distinction between first and third party cases is clearly relevant should a third party claimant attempt to sue an insurer for breach of *contract*, or for breach of the implied *contractual* duty of good faith and fair dealing (see, e.g., *Royal Globe, supra*, 23 Cal.3d 880, 889-890; *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940-941 [132 Cal.Rptr. 424, 553 P.2d 584])[13] but it is completely irrelevant in cases involving *tort* causes of action because the determinative relationship between plaintiff and defendant in tort cases is not one of contractual privity or of a "preexisting consensual relationship." Rather, it is one based on the balancing of public policy factors necessary in deciding whether a tort duty exists. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) Therefore, the majority's reliance on the first party/third party, "preexisting, contractual relationship" distinction is simply misplaced.

In *Fletcher*, the insured sued his insurer for, among other things, IIED. This claim was based on allegations that the insurer had made false and threatening communications to the insured for the purpose of causing him to

---

[13]Notably, none of the allegations in the first amended complaint suggest plaintiffs are attempting to state a cause of action for either contractual or tortious breach of the covenant of good faith and fair dealing, or that they are proceeding on a third party beneficiary contractual theory.

surrender his policy or to enter into a disadvantageous settlement. The jury returned a verdict for the insured, and the insurer appealed, conceding that its behavior towards its insured was outrageous, but contending that its conduct was privileged because it occurred during the process of settlement negotiations.

*Fletcher* held that an insurer, in pursuing its own economic interests, is privileged to assert its legal rights and to communicate its settlement position to its insured, despite a substantial certainty that in doing so it will cause its insured emotional distress. However, it also stated that this privilege is not absolute; such assertions must be made in a permissible way, and with a good faith belief in the existence of the rights asserted, and if the privilege is exercised in an outrageous manner, the person so doing may be held liable for IIED. (10 Cal.App.3d at p. 395.) It held that the insurer's bad faith refusals to make payments under the insured's policy of disability insurance, which were employed in concert with false and threatening communications to plaintiff intended to cause him to surrender his policy or accept a disadvantageous settlement, constituted conduct which could form the basis for an action for damages for IIED. (10 Cal.App.3d at p. 401.)

This reasoning is in clear contrast to the majority's assertion that it makes no difference in a duty analysis what reasons an insurer may have for refusing to settle a claim, or how those reasons are expressed, because it has no duty to a third party claimant to settle. According to the majority's view, in third party cases, insurers, with impunity, may refuse to settle claims for reasons entirely unrelated to questions of the insured's liability and/or the claimants' damages, instead justifying their refusal to settle simply on the basis of the insurer's economic self-interest. However, a society which depends on automobile liability insurance as much as ours does simply cannot afford to adopt such a viewpoint.

In *Little*, the insured sued defendant insurer for IIED after the defendant insurer purposefully ignored the great bulk of the information it had relating to its insured's medical condition as part of a course of justifying its predetermined course of discontinuing disability benefits to which the insured was entitled. Because of the financial hardships caused by the wrongful termination of her benefits, plaintiff was forced to sell her home and to live in a public housing project with her daughter, and thereafter suffered emotional distress resulting directly not only from defendant's conduct, but from the economic problems caused directly by defendant's conduct. Held, "[w]hile this conduct is less egregious than that of the defendant in *Fletcher* . . . , the jury was fully justified in impliedly finding defendant's conduct outrageous." (67 Cal.App.3d at p. 462.)

Plaintiffs here have alleged facts very similar to those held in *Fletcher* and *Little* to be sufficient to constitute a cause of action for IIED: that (1) the insurer had sufficient information regarding reasonably clear liability by its insured and plaintiffs' damages to implicate its duty to attempt, in good faith, to effectuate a prompt, fair and equitable settlement,[14] (2) the insurer did not make any attempt to effectuate a settlement for nearly three years after receiving such information, but instead, with no reasonable basis for believing such to be the case, denied liability and asserted falsely that plaintiffs had preexisting injuries (which implicitly would reduce any damages they would be entitled to receive, even assuming liability existed), (3) the insurer made no attempt to effectuate an equitable settlement for nearly three years, with knowledge of the financial and emotional distress plaintiffs were suffering because of the injuries caused by the accident with the insured and because of the concomitant loss of income and the expense of medical care, it being alleged in part that plaintiff, Judith Krupnick, was totally disabled by the accident and that plaintiffs, as of July 15, 1983, were on the verge of being evicted from their home due to such financial hardship, (4) the insurer knew plaintiffs were suffering severe emotional distress as a result of the insurer's refusal for more than three years to settle their claims, (5) the insurer then made a settlement offer with no more information than it had had some three months after the accident, and (6) this long period of refusing to effectuate a settlement was motivated by the insurer's desire to retain monies payable to plaintiffs under the policy for as long as possible.[15]

And, just as in *Little*, plaintiffs alleged facts from which it can be reasonably inferred that defendants here simply ignored their insured's admissions establishing the high likelihood of his liability, ignored plaintiffs' evidence of their injuries, and made unfounded assertions that plaintiffs had preexisting injuries, all as part of a course of justifying defendants' predetermined course of withholding payment of any settlement for as long as possible.

*There is no conceivable reason based on public policy or logic to allow first parties to recover for IIED under such facts while denying third party claimants the same right.* The only reason discernible in the majority's analysis is that "[i]nsurance companies exist to provide a critical financial indemnity *for the risks of their insureds* not to salve the feelings of the displeased third

[14]As mentioned above, plaintiffs here were injured when defendant's insured rear-ended them. *Beckham* v. *Safeco Ins. Co. of America* (9th Cir. 1982) 691 F.2d 898, 903, states at footnote 3 that "it seems to us liability is clear, not just reasonably clear" in incidents involving rear-end collisions.

[15]Though not specifically alleged, it is implicit in plaintiffs' complaint, and reasonably inferable from the facts alleged, that the refusal was also intended to pressure plaintiffs into accepting a less than equitable settlement for their emotional and financial distress.

party claimants" and that "[u]nder [the contract of indemnity with their insured] [an insurer's] only duty [is] to indemnify [the insured]"; and therefore "there [is] no legal reason or requirement for the insurance carrier ever to have anything to do with plaintiff third party claimants." This, of course, is patently untrue.

The fact that there *is* an implied *contractual* duty running to the *insured* to settle in an appropriate case (see *Murphy* v. *Allstate Ins. Co., supra,* 17 Cal.3d at pp. 940-941) and no such implied contractual duty running to an injured *claimant* (*id.* at p. 941), does *not* lead to the conclusion that the insurer has no separate duty to the claimant, pursuant to basic principles of tort law, the Insurance Code, and Civil Code section 1714. After the third party claimant has submitted a claim to the insurer and thereby established a relationship with it, the insurer has a duty to *attempt* to effectuate, in a reasonable amount of time, a fair and equitable settlement once liability has become reasonably clear and the insurer has a general idea of the nature and extent of the damages which the claimant could recover in an action at law.[16]

As to *tort* liability, one's entitlement to a remedy for a wrong against one should not be based on a party status distinction necessary for the application of *contract* law. The Supreme Court concluded such in *Moradi-Shalal* when it specifically stated that the demise of a *Royal Globe* statutory action under Insurance Code section 790.03, subdivision (h) did not affect third party common law causes of action for emotional distress and fraud by claimants against insurers. (46 Cal.3d at pp. 304-305.)

The majority also asserts that, according to Witkin, the "ratio decidendi" in "these *first-party cases,*" "derived from the *relationship of insured and insurer,*" and that "[i]n other words, the decided cases clearly show that the *same behavior* by respective defendants can be outrageous where there is privity and not where there is none."

*In fact, however, the cited passages in Witkin contain no such conclusion about the "ratio decidendi" of the noted cases, nor do the cases cited by the majority frame the issue of what is outrageous in terms of "privity" or*

---

[16]In an analysis of whether a duty based on a relationship exists between a given plaintiff and a given defendant, the relevant inquiry should be whether there was a relationship between the plaintiff and defendant *at the time the allegedly tortious event/breach of duty occurred.* The allegedly tortious act by defendants here was *not* the negligent operation by its insured of a motor vehicle and the resulting collision; rather, it was the defendants' negligent or intentionally oppressive handling of plaintiffs' claim. To repeat, plaintiffs and defendants here had an established relationship *before* such allegedly wrongful acts occurred, to wit, that of known claimants and known insurer engaged in the process of making and settling an insurance claim related to a specific negligent act by a known insured.

*"preexisting relationships."* Our Supreme Court already has defined what makes behavior outrageous, and this definition makes it clear that privity of contract or a preexisting relationship are not requisites: "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him [or her] power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; *or* (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (*Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 946, italics added.)

The facts alleged by plaintiffs here, which must be accepted as true for purposes of reviewing the propriety of granting defendants' motion for a judgment on the pleadings, show that defendants, as the insurers of the person who had injured plaintiffs and as the holders of the funds to which plaintiffs had a right to look for redress of their injuries, were in such a relationship with plaintiffs that it gave them the power to damage plaintiffs' interests by withholding such funds while knowing of plaintiffs' financial problems attributable to their insured's wrongful conduct. These alleged facts further show that defendants abused this relationship by their stonewalling tactics.

The alleged facts also demonstrate that defendants knew, or should have known, that plaintiffs were susceptible to injuries through mental distress and yet engaged in delaying activities and made false statements which they reasonably could recognize would undoubtedly cause the plaintiffs severe emotional distress because of the press of the financial problems proximately caused by the combination of the automobile accident and their resulting medical bills and lost income.

Furthermore, as to whether the facts alleged by plaintiffs here constitute "outrageous" conduct by analogy with the facts in *Fletcher* and *Little,* can it be said that the "civilized community" in which we live believes it is outrageous for an insurer to lie to an insured as part of a stonewalling tactic designed to break down the insured's resolve so as to obtain a disadvantageous settlement, but that it is acceptable to use the same tactics on an injured third party claimant as to whom the insured's (and hence the insurer's) liability has become reasonably clear? I do not think so, nor, apparently, did the Legislature (the elected representatives of California citizens) when it enacted Insurance Code section 790.03, which condemns as unfair business practices the use of such tactics on *both* insureds and claimants.

b. *Whether a Defendant Has Breached an Existing Duty to Refrain From Inflicting Emotional Distress on Another Person Does Not Depend on the Existence of a Preexisting or Special Relationship With the Plaintiff*

The majority also appears to advance an inherently contradictory proposition. It begins with the comment that to allege an "actionable" IIED cause of action against an insurer, plaintiffs need not allege the existence of contractual privity or of any kind of preexisting special relationship, and, in fact, it very clearly says that the "touchstone of an actionable claim for [IIED] is the outrageous nature of the defendant's conduct, . . . *without regard to a preexisting relationship.*" Yet the majority then proceeds to assert that the cases finding a *breach of duty* to refrain from IIED do so based primarily on the existence of a preexisting contractual special relationship. The majority next reiterates that it would never "be heard to say" that privity or a preexisting relationship is ever a necessary element in pleading an IIED cause of action, but then with no explanation restricts this broad and insistent statement to the establishment of a duty.

What the majority *really* appears to be saying is that as to that element of an actionable IIED action, i.e., the existence of a duty, a preexisting contractual special relationship need not be alleged, but as to another element of an actionable IIED action, i.e., the *breach* of the duty, such a relationship *must* be alleged. Thus, regardless of its protestations to the contrary, the majority does hold that a preexisting special relationship must be alleged for a viable IIED cause of action. Of course, no authority is cited by the majority for its proposition that the general duty to refrain from intentionally invading another's peace of mind can only be breached by one who has a preexisting relationship with the victim; common sense tells us that this cannot be the law.

A stranger who intentionally invades another person's peace of mind, and causes her severe emotional distress, is obviously just as liable to her for the breach of the relevant duty as would be her neighbor, friend or business associate. To put it another way, duty relates to actions one must take or refrain from taking to avoid causing harm to another. In turn, breach of duty relates to actions the defendant took or failed to take and thereby caused harm to another. It does not turn on the defendant's relationship with the victim. (See Black's Law Dict. (6th ed. 1990) p. 188, col. b and p. 189, col. a, respectively, which defines "breach" as "The . . . violating of a . . . duty, either by commission or omission," and "breach of duty," in pertinent part, as "[i]n a general sense, any violation or omission of a legal or moral duty.")

In conclusion, the majority's determination that plaintiffs here have not stated sufficient facts to constitute a cause of action for IIED by its characterizing plaintiffs' position to be that "the problem" was only the defendants'

reasons for the delay, and not the delay itself, and by its asserting that plaintiffs had to allege privity or a preexisting consensual relationship between plaintiffs and defendants because such is a necessary allegation to establish that the defendant's conduct was outrageous, or to establish that there was a breach of the defendants' duty to the plaintiffs, is insupportable by law, public policy or logic.

### B. Plaintiffs' "Causes of Action" for NIED and Violation of Civil Code Section 1714

The majority opinion discusses plaintiffs' "causes of action" for NIED and violation of Civil Code section 1714 (section 1714) in separate sections. (Maj. opn., *ante*, at pp. 194-209.) As pointed out below, I believe that these two "causes of action" must be discussed together.

### 1. In the Absence of (1) a Statutory Provision Exempting Insurers From Liability for Such Alleged Negligence or (2) Strong Public Policy Reasons Justifying Such an Exemption, Section 1714 Precludes This Court From Exempting Insurers From Liability for Damages to Claimants Caused by the Insurers' Negligent Acts

Plaintiffs pleaded, in addition to their cause of action for IIED, separate causes of action for NIED and for breach of the statutory duty imposed by section 1714, which provides, in relevant part, "(a) Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself. The extent of liability in such cases is defined by the Title on Compensatory Relief."[17]

This latter "cause of action" for breach of statutory duty is really not a separate cause of action. A cause of action is based on (1) a primary right possessed by the plaintiff, and (2) a primary duty devolving upon the defendant. (*Mayo* v. *White* (1986) 178 Cal.App.3d 1083, 1093 [224 Cal.Rptr. 373]; Pomeroy, Code Remedies (5th ed. 1929) p. 528.)

For example, a cause of action for IIED consists of plaintiffs' legally protected interest in peace of mind (see 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 403, at pp. 483-484 and cases cited therein) and of defendants' duty to refrain from intentional or reckless interference with that interest, while a cause of action for NIED, which is really simply a variation of a cause of action for negligence (see *Potter* v. *Firestone Tire & Rubber*

---

[17]The title on Compensatory Relief is found at Civil Code section 3281 et seq.

*Co., supra,* 6 Cal.4th 965, 984; *Burgess, supra,* 2 Cal.4th 1064, 1072; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278]; *Slaughter* v. *Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1249 [209 Cal.Rptr. 189]), consists of plaintiffs' same legally protected interest in peace of mind and of a different duty on the part of defendants, the duty to use ordinary care in activities from which harm reasonably might be anticipated if care is not taken. (6 Witkin, Summary of Cal. Law, *supra,* Torts, § 732, at p. 61, § 750 at pp. 87-89 and cases cited therein.)

Thus, section 1714, which sets out the fundamental principle that every one is responsible for the consequences of his or her negligent and intentionally tortious acts, is simply an alternative statutory basis of liability in support of plaintiffs' causes of action for NIED (and also IIED). (See, e.g., *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 413 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].) Therefore, in discussing the analytical flaws in that portion of the majority opinion regarding general legal theories of tort liability and plaintiffs' cause of action for NIED, it is useful to discuss plaintiffs' reliance on section 1714 as an alternative basis for finding that they stated a cause of action for negligence.

Section 1714 does not purport to proscribe any particular conduct; it simply states that every one is liable for damages caused by his or her intentional or negligent acts. Thus, it is not really accurate to say that defendants have "violated" section 1714; instead, as explained below, section 1714, which reflects public policy by legislation, is really authority for the principle that, in the absence of stronger public policy to the contrary, defendants should be held liable for any injury caused by their intentional or negligent acts.[18]

In that portion of the majority opinion related to plaintiffs' purported "cause of action" for "violation" of section 1714, the majority disposes of plaintiffs' reliance on section 1714 by criticizing plaintiffs for only citing section 1714 and *Rowland* as authority for the proposition that section 1714 imposes liability for NIED as alleged here.

However, the majority ignores plaintiffs' additional citation to *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 819 [119 Cal.Rptr. 858, 532 P.2d

---

[18]Of course, a defendant's liability for negligently causing injury in the form of mental distress is limited by the requirement that the distress must be "serious" (*Potter* v. *Firestone Tire & Rubber Co., supra,* 6 Cal.4th at p. 989, fn. 12) and that there must be either " ' ". . . proof of mental distress . . . of a medically significant nature," ' " or proof of " ' "some guarantee of genuineness in the circumstances of the case." ' " (*Potter* v. *Firestone Tire & Rubber Co., supra,* 6 Cal.4th at pp. 987-988, quoting *Molien, supra,* 27 Cal.3d 916, 931, quoting *Rodrigues* v. *State* (1970) 52 Hawaii 156, 173 [472 P.2d 509, 520].)

1226, 78 A.L.R.3d 393] (*Li*) for its position that section 1714 was intended to introduce into California's legal system a broad principle of responsibility based on continental or civil law, which would create a tort right of action that displaces more restricted common law limitations.

In *Li*, the California Supreme Court abolished the rule of contributory negligence, holding that it must give way to the doctrine of comparative negligence. In so doing, it specifically rejected the argument that section 1714 had codified the common law, thus rendering it invulnerable to judicially implemented evolution. Specifically, the court held, "[W]e conclude that the rule of liberal construction made applicable to the code by its own terms (Civ. Code, § 4, discussed *ante*) together with the code's peculiar character as a continuation of the common law (see Civ. Code, § 5, also discussed *ante*) permit if not require that section 1714 be interpreted so as to give dynamic expression to the fundamental precepts which it summarizes." (*Li, supra,* 13 Cal.3d at p. 822.) "Therefore, and for all of the foregoing reasons, *we hold that section 1714 of the Civil Code was not intended to and does not preclude present judicial action in furtherance of the purposes underlying it.*" (13 Cal.3d at p. 823, italics added.)

Thus, according to the authority cited by plaintiffs and ignored by the majority, *everyone* whose intentional or negligent acts cause injury to another must be held liable in tort therefor *unless* there is some "statutory provision declaring an *exception* to the fundamental principle enunciated by Civil Code section 1714" or "*unless [such exception from the general rule of liability is] clearly supported by public policy.* [Citations.]" (*Rowland, supra,* 69 Cal.2d 108, 112, italics added.)

The above noted authority, cited by plaintiffs, is more than sufficient to support plaintiffs' contention that, pursuant to section 1714, defendants can be held liable for NIED unless defendants could establish a statutory and/or public policy exception from such liability. Defendants have made no such effort before this court or the trial court.[19]

Support for the plaintiffs' reliance on section 1714 as a basis for their NIED cause of action also may be found in *Burgess*. In *Burgess*, the defendant argued that the plaintiff should be denied recovery for her emotional distress on public policy grounds. The California Supreme Court disagreed, stating:

---

[19]To repeat, contrary to the majority's position, the fact that *Rowland* and *Li* involved "personal injuries" in no way makes them inapplicable here. Emotional distress *is* a "personal injury," (see, e.g., 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 1403, 1409, 1410, pp. 874-875, 879-881) and section 1714 itself makes no distinctions between "physical" and "nonphysical" injuries, but applies to "injuries" in general. Furthermore, *Rowland* made no distinction between "physical" injuries and "nonphysical" injuries.

*"Our starting point in determining liability for negligence is the rule set forth in Civil Code section 1714, subdivision (a)*: 'Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself.' We have previously stated in the context of analyzing a claim for damages for emotional distress that *'[i]n the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy.' (Christensen,* [v. *Superior Court* (1991)] 54 Cal.3d [868,] 885, citing *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)" *(Burgess, supra,* 2 Cal.4th at p. 1079, italics added.)

The bottom line is this: As referred to earlier in this dissent, the majority opinion points to no statutory provision exempting automobile liability insurance companies from the operation of section 1714 as construed by *Rowland, Li* and *Burgess.* There is none. It also fails to engage in any meaningful policy analysis as to the existence of any public policy which would justify such an *exception* to the general rule of liability for one's negligence. Instead, the majority does nothing more than insist that it is up to *plaintiffs* to provide the policy reasons for *extending* liability in this factual situation, and never cites any authority for its position that, contrary to the requirements of section 1714, *Rowland,* and *Burgess,* it is not *defendants'* burden to justify an *exception* to the general rule of liability for the harm caused by one's negligent or intentional torts.

In other words, after incorrectly characterizing plaintiffs' relationship to defendants as nonexistent, after erroneously characterizing plaintiffs' causes of action as based on nothing more than plaintiffs' hurt feelings over defendants' reasons for delaying settlement, and after speciously characterizing plaintiffs' causes of action against the insurer (as opposed to the underlying action against the insured) as being for "purely" emotional distress, i.e., unaccompanied by any economic loss,[20] the majority opinion then attempts to place the burden on *plaintiffs* to come up with a public

---

[20]The majority's persistent emphasis on "purely" emotional distress as the only damages claimed by plaintiffs ignores plaintiffs' allegations of economic loss. Plaintiffs' complaint stated that their claim was worth at *least* the amount of the settlement, and states facts from which it can be inferred that they were pressured into accepting less money by emotional and economic distress caused by defendants' unfair delay. Because they alleged that liability for a sum of at *least* $295,000 was reasonably clear almost three years before they received the settlement, they suffered at *least* the economic loss measured by their loss of the use of that sum for the period defendants unreasonably refused to make a settlement offer, and denied their insured's liability for the accident and then unreasonably delayed offering to settle

policy justifying their cause of action under section 1714 rather than coming up with its *own* public policy reasons to justify *exempting* defendants from liability for their own negligent and intentional torts. As should be apparent from the tortured analysis and mischaracterizations of the facts and existing precedent leading up to this conclusion, the majority is simply trying to justify the result it desires, to wit, that insurers have no duty of care in their treatment of third party claimants.

### 2. *Fundamental Principles of Tort Law and Public Policy Preclude This Court From Exempting Insurers From Liability for Damages to Claimants Caused by the Insurers' Negligent Acts*

Because the majority opinion has given short shrift to any public policy analysis, and has totally ignored the well-settled and fundamental principles of tort law which form the basis of any discussion of policy vis-à-vis tort actions, the following discussion is necessary. Courts must follow the "fundamental principle" expressed in section 1714 that " ' ". . . whenever one person is by circumstances placed in such a position with regard to another . . . that if he did not use ordinary care and skill in his own conduct . . . he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger." ' " (*Tarasoff*, *supra*, 17 Cal.3d at p. 434, quoting *Rowland*, *supra*, 69 Cal.2d at p. 112, quoting *Heaven* v. *Pender* (1883) 11 Q.B.D. 503, 509.)

Departure from this principle is justified "only upon the 'balancing of a number of considerations' " (*Tarasoff*, *supra*, 17 Cal.3d at p. 434), one of the major ones being the foreseeability that the failure to use reasonable care will cause harm to another. (See, e.g., *Burgess*, *supra*, 2 Cal.4th at pp. 1079-1080; *Tarasoff*, *supra*, 17 Cal.3d at p. 434; *Doe* v. *Roe* (1990) 218 Cal.App.3d 1538, 1543-1544 [267 Cal.Rptr. 564].) "As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' [Citations.]" (*Tarasoff*, *supra*, 17 Cal.3d at pp. 434-435.)

Instead of a reasoned application of policy factors in a consideration of whether, when liability under an insurance policy is reasonably clear, and the extent of the claimants' injuries are reasonably susceptible to objective evaluation, insurers owe claimants a duty either (1) to refrain from a bad faith refusal to settle or an unreasonable delay in attempting to settle fairly

---

plaintiffs' claim. (See also *Moradi-Shalal*, *supra*, 46 Cal.3d at p. 305: "In addition, prejudgment interest may be awarded where an insurer has attempted to avoid a prompt, fair settlement. [Citation.]")

and in good faith so as to obtain a negotiating advantage or (2) to exercise reasonable care in attempting to settle the claim promptly and equitably, the majority heavily relies on *Bro* and *Burgess* to support the bald conclusion that *no* common law cause of action of any kind has existed in favor of third party claimants against insurers.

As discussed below, *Bro*, which was authored by the author of the majority opinion here, is factually inapposite. The portions of *Bro* relied upon by the majority are dicta and its analysis is flawed. The majority completely misinterprets *Burgess*'s statement of the factors used to determine a direct victim and then further errs by stating that the *Burgess* court's recitation of two of the three bases for duty is dictum.

Before addressing those authorities, I will remind the reader that the California Supreme Court, in *Moradi-Shalal*, clearly acknowledged the existence and continued viability of common law causes of action maintainable by claimants as well as by insureds against automobile insurers when it said: "Moreover, apart from administrative remedies, the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, *infliction of emotional distress*, and (as to the insured) either breach of contract or breach of the implied covenant of good faith and fair dealing." (46 Cal.3d at pp. 304-305, italics added.)

Contrary to the majority's proposition, the Supreme Court did not suggest in *Moradi-Shalal* that third party claimants could never be "direct victims" of wrongful acts by insurers, particularly when such acts were unnecessary to carry out the insurers' duties to the insured, and were specifically directed at the claimants rather than the insured. Further, contrary to the majority's implication that the fact that the Supreme Court did not specifically refer to NIED means that it intended to limit a claimant's infliction of emotional distress cause of action against insurers to IIED, in my view it is more reasonable to conclude that because the Supreme Court has recognized for some time the viability of causes of action both for IIED and NIED, it found it unnecessary to specifically state "intentional and negligent" but instead intended that both types of conduct could form the basis of common law actions by claimants against insurers for infliction of emotional distress.

I return to *Bro* and *Burgess*. The majority's reliance on *Bro* (maj. opn., *ante*, at pp. 190, 204-205) and its misinterpretation of *Burgess* (maj. opn., *ante*, at pp. 203-206) are an effort to demonstrate that plaintiffs here are not direct victims and therefore are not able to plead a cause of action for NIED. This reliance is misplaced for four reasons: (a) the *Bro* "two-pronged" test is

mere dictum, (b) *Bro*'s analysis is deficient because it assumes that there can be no duty without a preexisting "consensual" or "special" relationship, but it ignores continuing authority that a duty may also be assumed by the defendant or imposed by law, (c) the facts of *Bro* make it inapposite to plaintiffs' case, and (d) the majority's interpretation of *Burgess*, which rejects the holding in *Burgess* that duty may be assumed by a defendant or imposed by law, as well as may arise from a relationship between the defendant and plaintiff, is simply wrong.

### a. *Bro's Two-pronged Test Is Dictum*

*Bro* suggests a two-pronged test for the determination of whether a plaintiff has a cause of action for NIED: (1) Did plaintiff at the time of the tortious conduct have a preexisting consensual relationship with the defendant (so as to bring plaintiff within *Bro*'s definition of a "direct victim") (*Bro, supra,* 22 Cal.App.4th at p. 1416), and, if so, (2) was the defendant's conduct, which caused plaintiff emotional distress, so outrageous that it "rise[s] to that level where, as a policy matter, liability shall attach. [Citation.]" (*Id.,* at pp. 1440-1441, italics deleted.)

Notably, *Bro* does not *hold* that its two-pronged test should or must be applied in determining the existence of a viable NIED action. The *Bro* opinion refers to a "*prescribed* test" (*Bro, supra,* 22 Cal.App.4th at p. 1402, italics added), ". . . the first prong of the test we *recommend*" (*id.* at p. 1416, italics added), "our *recommended* test" (*ibid.,* italics added), "our *suggested* test" (*id.* at p. 1431, italics added), "we *suggest* that the way to decide these cases is . . ." (*id.* at p. 1437, italics added), ". . . we have synthesized in terms of a 'Black Letter' *proposition* . . ." (*id.* at p. 1441, italics added), "under our *recommendation*" (*ibid.,* italics added), and ". . . *should* our *recommended* approach be used" (*ibid.,* italics added). Clearly, this so-called test is presented by *Bro* as dictum. (See the definition of dicta at fn. 27 on p. 248, *post.*)[21]

---

[21]The lack of an actual holding in *Bro* as to the two-pronged test may be based on the fact that while the Bros' appeal from the granting of summary adjudication of issues in favor of the defendant doctor as to their NIED cause of action was still pending, the defendant doctor was granted judgment as to their cause of action for medical malpractice, i.e., for negligence. If the doctor's conduct did not negligently cause a cut to the face of the Bros' child in the process of her birth, then it is difficult to see how the Bros could have alleged a valid cause of action for NIED based on a direct victim theory by reason of observing the bandaged cut half an hour after the delivery. Lacking such negligence, the summary adjudication on the NIED action for the doctor could have been affirmed on such basis. Therefore, there was no need to create a suggested two-pronged test to determine whether the Bros were "direct victims" of the doctor's nonexistent negligence.

### b. *Bro's Analysis Is Flawed*

In the evolvement of the "direct victim" first prong of the recommended test, *Bro* categorized 26 cases supposedly depending upon whether, in each case, there was an explicit or implicit ruling that a "preexisting consensual" relationship existed between the plaintiffs and defendants, which relationship would then make the plaintiffs "direct victims." (*Bro, supra,* 22 Cal.App.4th at pp. 1416, 1417-1420.) Finding such a relationship to exist in certain cases, *Bro* then further categorized those cases based on whether the claim for emotional distress damages was "adjunct" or "nonadjunct" to other tortious conduct claims. (*Id.* at pp. 1420-1437.)

Rather than wade into *Bro*'s morass of individual cases by way of a written analysis, I simply repeat that not *one* of these cases held, explicitly *or* implicitly, that a preexisting consensual relationship is the *only basis* on which one can conclude a plaintiff was a "direct victim" or referred to "adjunct" or "nonadjunct" claims.

Furthermore, the *Bro* court's apparent obsession with the "consensual" element in the analytic factor "preexisting relationship" was so great that, in its attempt to fit cases into the procrustean bed of its preexisting consensual relationship prong, it simply concluded, because many of the post-*Molien* cases it cited, including *Burgess*, involved a consensual relationship between plaintiff and defendant before the allegedly tortious conduct, that it could infer that the preexisting relationship had to be consensual in *all* NIED actions in order for a duty to exist and a plaintiff to be a direct victim. (*Bro, supra,* 22 Cal.App.4th at pp. 1415-1416.) *However, not one of these post-Molien cases used the phrase "consensual relationship" or the term "consensual."*

*Bro*'s reasoning studiously ignores, or actively attempts to negate, the well-established legal principle that duty may arise from a preexisting relationship, *or* it may be imposed as a matter of law, *or* it may be assumed by the defendant without regard to the existence of a preexisting relationship. (See, e.g., *Burgess, supra,* 2 Cal.4th at pp. 1072-1073.)

*Bro*, in its analysis and its classification of the catalogue of post-*Molien* cases (and then its creation of a suggested two-prong test based on such analysis) proceeds on the faulty premise that the existence of a preexisting "consensual" or "special" relationship is the *only* possible legal basis for finding that a defendant owed a plaintiff a legal duty. This failure to consider the other two alternate sources of duty is one of *Bro*'s fatal flaws.

The failure to look at alternate sources of duty is comparable to a scientist who is studying a given effect—for example, wilting in plants—using as a

premise the principle that there is only one cause of wilting in plants—lack of watering. Using such an assumption, the scientist would conclude that if a plant wilted, its soil had not received enough water, a conclusion which would be scientifically incorrect, given that causes other than lack of watering may cause wilting, e.g., excessive heat, disease, and damage to root systems caused by gophers and insects. It would be difficult to imagine that anyone with some knowledge of plants would make the above noted assumption about the cause of wilting.

I find it equally difficult to understand how persons with some knowledge of tort law could conclude that a direct victim is defined *only* by reference to the existence of a preexisting consensual relationship with the defendant (see 22 Cal.App.4th at pp. 1415-1416), given the fact that *Burgess*, on which the *Bro* court relied for its faulty premise, specifically stated: "the label 'direct victim' arose to distinguish cases in which damages for serious emotional distress are sought as a result of a breach of duty owed to the plaintiff that is '*assumed* by the defendant *or imposed* on the defendant *as a matter of law*, *or* that arises out of a *relationship* between the two.' [Citation.]" (2 Cal.4th at p. 1073, italics added.)[22]

The difficulty in understanding the *Bro* court's studied exclusion of these other two sources of duty is compounded by the fact that less than a year ago the California Supreme Court issued its opinion in *Potter* v. *Firestone Tire & Rubber Co.*, *supra*, 6 Cal.4th 965, 984, addressing the nature of the torts of NIED and IIED. As to NIED it stated: "The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element. [Citations.] That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship. [Citation.]"

## c. *Bro's Facts Make It Inapplicable to Plaintiffs' Allegations*

The majority's reliance on *Bro* is also misplaced because *Bro* is factually inapplicable here. Pursuant to the holding in *Burgess*, Donna Bro, at least, was a direct victim (the *Burgess* court having held that an obstetrician owes a pregnant client a direct duty to use reasonable care in delivering her child, which duty includes, of course, a duty not to negligently cause her emotional distress by injuring her fetus and child during birth). (2 Cal.4th at pp. 1076,

---

[22]It should go without saying that section 1714 is statutory law imposing a duty on all persons, including automobile liability insurers, to exercise ordinary care to avoid injuring another person, i.e., third party claimants.

1078.)[23] But the emotional distress suffered by Ms. Bro and Kim Bro, the father, was caused by their observation of the injury to their newborn child when the child was presented to them *after* birth.

The majority has nowhere suggested that plaintiffs *here* alleged that they suffered emotional distress as a result of observing injury to someone else caused by defendants' negligent acts. Rather, plaintiffs have alleged that the acts complained of were directed at them—that *they* were told that defendants did not believe the insured was liable, that *they* were told that they had preexisting injuries, and that it was *their* claims which the defendants failed to settle for almost three years once liability and damages were reasonably clear. In other words, plaintiffs are "*direct victims*" of defendants in the sense that defendants' negligent conduct involved defendants' direct dealings with plaintiffs and directly impacted them, causing plaintiffs economic injury as well as emotional distress, not "purely emotional distress" to which type of recovery *Bro* continually emphasizes it is restricted.[24]

  d.  *Burgess's Statement Regarding the Sources of Duty Was Not Mere Dictum*

The majority here, as well as the court in *Bro*, misinterpret *Burgess* by reading one single aspect of *Burgess* as constituting the entire rule of law as to who is a "direct victim," i.e., a person who had a preexisting consensual relationship with the defendant.[25] As *Burgess* itself makes clear, the presence or absence of a preexisting relationship, consensual or not, between a plaintiff and defendant is not the be-all and end-all of establishing whether a defendant owes a duty of due care to a given plaintiff:

"The distinction between the 'bystander' and 'direct victim' cases is found in the source of the duty owed by the defendant to the plaintiff. The

---

[23]Noting that ". . . the mother's emotional well-being and the health of the child are inextricably intertwined," *Burgess* held that because of these "physical and emotional realities," "[a]ny negligence during delivery which causes injury to the fetus and resultant emotional anguish to the mother, therefore, breaches a duty owed directly to the mother." (2 Cal.4th at p. 1076.) The court then concluded that the mother's claim for emotional distress was thus simply "an element of damage compensation" in an ordinary malpractice action. (*Id.* at p. 1077.)

[24]It is noteworthy that *Bro*'s lengthy "catalogue" of twenty-six post-*Molien* cases did include nine cases which found liability for NIED on a direct victim theory, seven of which upheld emotional distress damages. (22 Cal.App.4th at p. 1444.)

[25]As already discussed above, plaintiffs and defendants here did have a relationship which preexisted defendants' allegedly tortious conduct, so this pronouncement by the majority has two defects: the implicit and erroneous factual assumption that plaintiffs here had no prior relationship with defendants (maj. opn., *ante*, at p. 206), and the explicit misreading of *Burgess* to support the majority's position that such a relationship, and only such a relationship, creates the requisite duty which, in turn, distinguishes "direct victims" from "bystanders." (Maj. opn, *ante*, pp. 205-206.)

'bystander' cases, commencing with *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], and culminating in *Thing, supra*, 48 Cal.3d 644, address 'the question of duty in circumstances in which a plaintiff seeks to recover damages as a percipient witness to the injury of another.' (*Christensen, supra*, 54 Cal.3d at p. 884.) These cases 'all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general.*' (*Ibid.*, italics added.) In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another.

"Because in such cases the class of potential plaintiffs could be limitless, resulting in the imposition of liability out of all proportion to the culpability of the defendant, this court has circumscribed the class of bystanders to whom a defendant owes a duty to avoid negligently inflicting emotional distress. These limits are set forth in *Thing* as follows: 'In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.' (48 Cal.3d p. 647.) [Fn. omitted.]

"In contrast, the label '*direct victim*' arose to distinguish cases in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is '*assumed by the defendant or imposed on the defendant as a matter of law, or* that arises out of a relationship between the two.' (*Marlene F., supra*, 48 Cal.3d at p. 590.) In these cases, the limits set forth in *Thing, supra*, 48 Cal.3d 644, have no direct application. (*Marlene F., supra*, 48 Cal.3d at p. 589, fn. 4; *Christensen, supra*, 54 Cal.3d at pp. 890-891.) *Rather, well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case.*" (*Burgess, supra*, 2 Cal.4th at pp. 1072-1073, first italics in original, other italics added.)

After recognizing the confusion engendered by the *Molien* court's perceived failure to establish clear-cut criteria for characterizing a plaintiff as a "direct victim" rather than a "bystander," the *Burgess* court continued:

"Nevertheless, other principles derived from *Molien, supra*, 27 Cal.3d 916, are sound: (1) damages for negligently inflicted emotional distress may

be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached. (*Christensen, supra,* 54 Cal.3d at pp. 890-891; *Marlene F., supra,* 48 Cal.3d at pp. 590-591.) In fact, it is this later [*sic*] principle which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess, supra,* 2 Cal.4th at p. 1074.)

When this last portion of *Burgess,* quoted by the majority at page 206 of its opinion, is read in context, it is apparent that a "direct victim," as opposed to a "bystander," may be anyone to whom the defendant owed a duty of care because such duty was " 'assumed by the defendant *or* imposed on the defendant as a matter of law, *or* [because it arose] out of a relationship between the two.' " (*Burgess, supra,* 2 Cal.4th at p. 1073, italics added.)[26]

The majority here, and the court in *Bro,* ignore this clear language that a defendant may owe a plaintiff a duty of care for a number of independent reasons by referring to it as "dicta" and by "reject[ing]" it. (Maj. opn., *ante,* at pp. 205-206.) It is not dicta; it is a rule of law,[27] and a well-established rule of law.[28] The majority's strained effort to "reject" these other well-established legal bases of duty as dicta is more evidence of how important it

---

[26]An alternative expression of this concept is that: "A duty of care may arise through statute or by contract. Alternatively, a duty may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society. [Citation.]" (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]; *Violette* v. *Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358].)

[27]Compare "dicta," Black's Law Dictionary (6th ed. 1990) page 454, column a ("Opinions of a judge which do not embody the resolution or determination of the specific case before the court. Expressions in court's opinion which go beyond the facts before the court and therefore are individual views of author of opinion and not binding in subsequent cases as legal precedent.") with "rule/rule of law," *id.* at page 1332, column a ("A legal principle, of general application, sanctioned by the recognition of authorities, and usually expressed in the form of a maxim or logical proposition. . . .")

[28]See, e.g., *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 806 [221 Cal.Rptr. 840, 710 P.2d 907], italics added: "By voluntarily undertaking the business of a common carrier, the RTD *assumed* the common law duty to protect the plaintiffs from harm at the hands of their fellow passengers. Moreover, the RTD became subject to the specific mandatory duty *imposed* by California statute on every common carrier to use the utmost care and diligence for its passengers' safe carriage . . ."; *Coffee* v. *McDonnell-Douglas Corp.* (1972) 8 Cal.3d 551, 557 [105 Cal.Rptr. 358, 50, P.2d 1366], footnote omitted, italics added: "An employer generally owes no duty to his prospective employees to ascertain whether they are physically fit for the job they seek, *but where he assumes such duty, he is liable if he performs it negligently.* [Citations.] The obligation assumed by an employer is derived from the general principle expressed in section 323 of the Restatement Second of Torts, that *one who voluntarily undertakes to perform an action must do so with due care*"; *Mexicali Rose* v. *Superior Court* (1992) 1 Cal.4th 617, 636 [4 Cal.Rptr.2d 145, 822 P.2d 1292], italics added:

is to it to reach its desired result: that an insurer never be held to owe a duty of care to a third party claimant.

In conclusion, plaintiffs have stated sufficient facts to establish that defendants owed them a duty under all three bases for duty mentioned in *Burgess*. First, plaintiffs had a *relationship* with defendants which *preexisted* defendants' allegedly tortious act, i.e., that of persons known by defendants to be asserting a claim against defendants' insured because the insured had negligently rear-ended them. Second, the law *imposes* a duty on defendants as insurers and in favor of plaintiffs as claimants to exercise reasonable care in the handling of automobile liability claims. (See § 1714.) Third, by selling policies of automobile liability insurance in California, defendants here voluntarily *assumed* the duty to act with reasonable care in managing their automobile liability insurance business so as not to harm plaintiffs as claimants making claims against the defendants' insured under an automobile liability insurance policy between defendants and the insured.

### e. *Public Policy Considerations Do Not Support Excepting Insurers From the General Common Law or Civil Duty to Use Ordinary Due Care, but, to the Contrary, They Mandate That Such Liability Apply to Insurers*[29]

Although the majority opinion does not clearly frame the issue before it, I believe that the ultimate issue to be addressed in determining whether plaintiffs can allege a NIED cause of action against defendants is whether an automobile insurance company is *excepted* from a common law or civil duty of ordinary care to claimants, once such claimants against the insured and their injuries and losses are made known to the insurer.

To restate, contrary to the majority opinion, no public policy reasons need be alleged by plaintiffs for the *imposition* of basic tort liability for negligently caused emotional distress. Such liability is imposed by section 1714. Rather, it is defendants' burden to point to policy reasons to exempt them from that broad scope of liability. (See *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 419 [11 Cal.Rptr.2d 51, 834 P.2d 745]: "Under this rule [§ 1714, subd. (a)], an individual who has acted negligently is liable for *all* reasonably foreseeable injuries caused by that negligence. To this rule of general liability, courts will make only those exceptions that are 'clearly supported by public policy.' [Citations.] [¶] Under the fundamental principle

---

a warranty as to the fitness of food is not a contractual warranty, " 'but is an obligation *imposed by law* to protect public health.' [Citations.]"

[29]This discussion should not be construed to negate my earlier observation that a reasonable reading of *Moradi-Shalal* reveals that the Supreme Court has already confirmed the existence of such a common law cause of action.

governing the scope of negligence liability, accountants are liable for all reasonably foreseeable injuries caused by the negligent performance of their professional duties. This would necessarily include injuries to foreseeable users like the plaintiffs in this case. If negligent accountants are to be granted special dispensation from the general scope of liability, this dispensation must be justified by considerations of public policy." See also *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 885 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

As has been noted by many courts: *"Our starting point in determining liability for negligence is the rule set forth in Civil Code section 1714, subdivision (a)*: 'Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself.' We have previously stated in the context of analyzing a claim for damages for emotional distress that '[*i*]*n the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy.*' (*Christensen, supra*, 54 Cal.3d at p. 885, citing *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 . . . .)" (*Burgess, supra*, 2 Cal.4th at p. 1079, italics added; see also *Ahern* v. *Dillenback* (1991) 1 Cal.App.4th 36, 42 [1 Cal.Rptr.2d 339]: "In the typical negligence action, a determination that there is no duty giving rise to liability is essentially a conclusion that the weight of public policy *warrants a departure from Civil Code section 1714.* [Citations.]" [Italics added.])

The determination whether in a specific case the defendant will be held liable in tort to a third person, not in privity, is a matter of policy and involves the balancing of various factors. (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358].) The factors include " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.' [Citation.]" (*Christensen* v. *Superior Court, supra*, 54 Cal.3d 868, 885-886; *Burgess, supra*, 2 Cal.4th at pp. 1079-1080.)

As discussed above, a continuing series of Supreme Court cases hold that section 1714 establishes as a fundamental principle that all persons have

a duty to exercise ordinary care to avoid causing injuries to others and, absent a statutory exception, the only other possible exception to this principle is one based on public policy. In *Rowland*, the court indicated that the above-noted policy factors are used to determine whether an exception to liability should be made. It stated: "A departure from this fundamental principle involves the balancing of a number of considerations; the major ones [being those factors as quoted above from *Biakanja*]." (69 Cal.2d at pp. 112-113.)

Other Supreme Court opinions refer to section 1714 as being the beginning point in the determination of liability for negligence, i.e., they use these same factors to determine whether or not there is a duty. For example, in *Christensen* v. *Superior Court, supra*, 54 Cal.3d 868, the court approached its analysis from the perspective that the plaintiff was asserting that the conduct of another breached a *duty* owed to plaintiff and, therefore, the court concluded, ". . . public policy considerations are relevant in determining whether a particular plaintiff may recover damages for emotional distress." (*Christensen* v. *Superior Court, supra*, 54 Cal.3d at p. 885.) As stated in *Thompson* v. *County of Alameda, supra*, 27 Cal.3d at page 750: "It is a fundamental proposition of tort law that one is liable for injuries caused by a failure to exercise reasonable care. We have said, however, that in considering the existence of 'duty' in a given case several factors require consideration including [those factors as quoted above from *Biakanja*.]"

Thus, irrespective of defendants' failure to apply the above enumerated policy factors so as to justify exempting them from the general statutory duty of ordinary care to plaintiffs as third party claimants, I now will consider and apply those same factors to ascertain whether defendants had such a duty (either statutory or common law) to plaintiffs when plaintiffs submitted their claims to defendants and thereafter.

After balancing the above discussed policy factors against each other in light of the alleged facts in the complaint, my conclusion is that such a duty exists and has its source in common law, as well as in section 1714, and further such analysis demonstrates that if the defendants had attempted to establish their exemption from a duty under section 1714, they would have failed.

i. *Foreseeability That Defendants' Failure to Use Ordinary Care Would Cause Harm to Plaintiffs*

Although "[t]he foreseeability of a particular kind of harm plays a very significant role in [determining whether there should be a departure from the

general rule that all persons have a duty to use ordinary care to prevent injury to others as a result of their conduct] (see *Dillon* v. *Legg* [1968] 68 Cal.2d 728, 739), . . . a court's task—in determining 'duty' [as a matter of law]—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)[30]

In terms of this general concept of the foreseeability of harm if ordinary care is not exercised, it is patently foreseeable by automobile liability insurance companies that a person injured in an automobile accident will rely on the tortfeasor's automobile insurer to investigate the resulting third party claim in a prompt and competent manner, and to make a prompt and reasonable settlement offer within the policy limits. (See, e.g., *Barrera* v. *State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 [79 Cal.Rptr. 106, 456 P.2d 674]: "The rule that an insurer must act promptly finds its source in the *quasi-public nature* of the insurance business and the reasonable expectation of the applicant *and the general public.*") (*Id.* at p. 673, italics added.)[31]

---

[30]As to the "foreseeability" factor, the majority claims that "when the claim is for purely emotional distress, it is our view that foreseeability is essentially useless" (maj. opn., *ante*, at p. 201), based on its interpretation of language in *Thing* and *Burgess*. (Maj. opn., *ante*, at pp. 201-202.), However, those cases simply stated that foreseeability *alone* cannot be used to determine duty and, inferentially, that foreseeability is not the *controlling* factor. Foreseeability, however, is an important factor to be balanced against *other* factors in the public policy analysis. (See *Ann M.* v. *Pacific Plaza Shopping Center*, *supra*, 6 Cal.4th 666, 676.)

[31]The majority avoids this language, and subsequently quoted holdings in *Barrera* v. *State Farm Mut. Automobile Ins. Co.*, *supra*, by purporting to distinguish *Barrera* on its facts, and by implying that these holdings only would be relevant if plaintiffs here had obtained a judgment against Hester, Hartford's insured, and if Hartford had then declined to pay the judgment, or if Hartford had failed to investigate the insurability of Hester before issuing him a policy.

However, the various holdings in *Barrera* as to automobile liability insurers' duties to *the general public* were not limited to situations in which a claimant had obtained a judgment against the insured: the *Barrera* court specifically held the insurer's duty to investigate its insured's insurability ran from the time the insured's policy was issued, *not* from the time the injured claimant obtained a *judgment* against the insured. (71 Cal.2d at pp. 669-670.) The public policy reasons behind this holding in *Barrera* have *nothing* to do with the specific procedural facts of *Barrera*, and *everything* to do with the role of automobile liability insurers in today's society and vis-à-vis the financial responsibility laws which require drivers to obtain automobile liability insurance. They cannot be distinguished away on the basis of the procedural differences relied upon by the majority.

Curiously, the majority also posits that the holding in *Barrera* "is a complete refutation of plaintiffs' contention that 'the insurance company owes a duty to the injured claimant' in emotional distress cases. [Citations.]" If, as the majority asserts, the holding in *Barrera* is

A claimant's reliance on an insurer's exercise of ordinary care in investigation and settlement negotiations is particularly foreseeable because of:

(1) the existence of the financial responsibility laws which require drivers to obtain insurance,

(2) the existence of case law which points out the public policy behind such laws of making sure injured persons are compensated (see, e.g., *Barrera* v. *State Farm Mut. Automobile Ins. Co.*, *supra*, 71 Cal.2d 659: "The reasonable expectation of *both* the public and the insured is that the insurer will duly perform its basic commitment: to provide insurance. [Citation.]") (*Id.* at p. 669, italics added),

(3) the automobile liability insurer's role as a government-regulated, public service entity with its concomitant duties to the general public as well as to its insured (see *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216 [32 Cal.Rptr.2d 807, 878 P.2d 566]),

(4) the public policy to provide compensation for those injured through no fault of their own,

(5) the judiciary's responsibility *not* to interpret the law applicable to automobile liability insurance in a manner "which would serve only the financial interest of the insurer and directly thwart that public policy" (see, e.g., *Barrera* v. *State Farm Mut. Automobile Ins. Co.*, *supra*, 71 Cal.2d 659, 672, 669-682 and fns. 8, 9, 10, 12 and 13 therein), and

(6) the existence of Insurance Code section 790.03, which brands as unfair business practices the pattern of conduct which unreasonably delays the payment of, or results in a total refusal to pay, settlements to injured claimants.

It is also foreseeable that the failure to handle such claims in a reasonable manner, i.e., promptly and in good faith, will result in financial harm to injured claimants, who will have had to personally pay their medical and property damage expenses, most likely at the expense of not paying or not paying on time other day-to-day expenses, particularly if they had no medical or health insurance coverage, or limited coverage or high deductibles. It is also foreseeable that claimants may have lost wages or even employment as a result of the injury. In turn, it is reasonably foreseeable that

---

inapplicable to third party claims for NIED, because "*Barrera* had nothing to do with a third party claim for [NIED]," then obviously such holding *cannot* be a "complete refutation" of the above noted contention.

financial problems, especially when coupled with physical injuries, will cause emotional distress to the injured claimants.

Furthermore, the foreseeability of increasing harm rises in proportion to the length of the delay measured against the obviousness of liability and the seriousness of the damages suffered by the claimant; thus, in a case such as the one here, where, as discussed above, defendants, having the alleged knowledge of (1) the *reasonably clear liability* of their insured, (2) the significant degree of physical, economic and mental distress injuries to plaintiffs, and (3) plaintiffs' dire financial straits, reasonably could foresee that a misrepresentation to plaintiffs concerning the insured's liability and plaintiffs' preexisting injuries, plus the failure for a period of *almost three years* to attempt in good faith to promptly, fairly and equitably settle plaintiffs' claim, would cause harm to plaintiffs in the form of severe emotional distress and loss of the use of an equitable monetary settlement.

Thus, in my opinion, it is reasonably foreseeable, if a defendant engages in the type of conduct alleged here, that the conduct is likely to result in the kind of harm allegedly experienced by plaintiffs here. Therefore, defendants' ability to foresee the possible harm is one factor which weighs in favor of imposition of liability on defendants who have engaged in such conduct.

> ii. *Degree of Certainty That Plaintiffs Actually Suffered Injuries, and*

> iii. *Closeness of Connection Between Defendants' Conduct and Plaintiffs' Injuries*

The allegations in the complaint state with certainty the emotional and financial distress suffered by plaintiffs and clearly show the direct connection between those injuries and defendants' conduct.

> iv. *Moral Blame Attached to Defendants' Conduct*

Defendants' alleged conduct is proscribed by public policy as recited in section 790.03, subdivision (h) of the Insurance Code. However, even if section 790.03, subdivision (h) did not exist, in my opinion, it is morally blameworthy to make knowingly or recklessly false statements for the purpose of benefiting the speaker by providing it with a rationale for refusing to attempt to settle a valid business obligation which the speaker had freely bargained to assume for monetary compensation. This conduct is particularly egregious when it is foreseeable that such conduct will injure the party to whom the obligation was to be paid, given that the obligation was designed to cover promptly the party's lost income and medical expenses.

### v. *Policy of Preventing Such Harm*

It is generally recognized that one purpose of tort liability is to deter future harm. (*Burgess, supra,* 2 Cal.4th 1064, 1081 and authorities cited there.) I believe that a rule of liability that (1) fulfills the reasonable expectations of the general public that a person injured by an insured motorist will receive prompt and equitable recompense from the insured's insurer for the damages suffered when the circumstances known to the insurer are such that a reasonable person would conclude that the insured was wholly or partially at fault for, and a cause of, such damages and (2) provides insurers with an adequate incentive to use ordinary care in handling such persons' claims, particularly given a contrary financial incentive for insurers "to drag their feet" in resolving such claims, regardless of merit, is necessary to avoid the harm alleged by plaintiffs.[32]

Without a remedy for such potential wrongs, some injured claimants will continue to experience improper and unreasonable handling of such claims, with the resulting increased disruption in their financial affairs. Negative ripple effects on other aspects of their lives will ensue and in some cases there will also be a concomitant cost to society in terms of increased demands on public resources by such victims.

---

[32]In *Holmgren* v. *State Farm Mut. Auto. Ins. Co.* (9th Cir. 1992) 976 F.2d 573, a third party claimant recovered a judgment after suing the insurer pursuant to a then existing statutory right of action against insurers for bad faith settlement negotiations. The underlying facts of that case are similar to those alleged by the Krupnicks: the insured's liability was clear soon after the accident; the claimant suffered injuries requiring medical attention, and lost her job as a result of her injuries; the claimant's spouse was unemployed, and after claimant lost her job, their home was foreclosed upon; the claimant's fiscal pressures were regularly communicated to the insurer, which offered a small amount in settlement just before the foreclosure, and which did not offer another settlement until two years after the accident, on the second day of trial.

The reviewing court, in affirming the judgment in the claimant's favor, noted:

"When coverage and liability are established, beyond any doubt, as in this case, a game of the strong against the weak *can* begin. A claim known to be valid and legitimate can be settled for far less than its actual value if the need for funds by the victim is great enough and the insurance company is obstinate enough to use its knowledge of that fact to force acceptance of a lesser sum. The theory of the game is to put the victim in a position where anything is better than nothing. Section 33-18-201(6) [Mont. Code Ann.] provides that an insurer's obligation to settle a claim promptly arises when liability has become reasonably clear. Most insurance companies recognize that sound business practices favor prompt payment of valid and legitimate claims, but this record establishes bad faith and more." (976 F.2d at p. 578, italics in original.)

vi.  *Extent of Burden on Defendants and Consequences to the Community of Imposing on Insurance Companies a Duty to Exercise Reasonable Care With Resulting Liability for Its Breach*

a.  *Consequences to the Community*

In my opinion, there are no negative consequences to the citizenry of California from requiring insurance companies to meet the above discussed standard of care. One of the most popular reasons for limiting the liability of businesses, of course, has been that without some limitation on liability, the costs of tort litigation will simply be passed on to the consumer, and the majority here has assumed that the increased costs to insurers which will flow from holding them responsible for unreasonable settlement practices vis-à-vis third party claimants will be passed along to the insurers' policy holders in the form of increased premiums. (Maj. opn., *ante*, at p. 204.) However, making insurers financially responsible for unreasonable settlement practices presumably would act as an incentive for such businesses to exercise greater care in such matters, thus reducing potential litigation and liability costs. The marketplace would then reward those insurers who acted reasonably and thus kept their costs down, because presumably drivers, who are compelled by law to purchase automobile liability insurance, would seek to buy policies with the lowest premium available for the best coverage.

Furthermore, there are strong *positive* consequences in making insurers bear the costs of their negligent and intentional torts vis-à-vis third party claimants, in that members of the public, who are injured by the wrongful conduct of an insured, may be assured that they would be compensated fairly and in a timely manner by insurance companies, who are engaged in a public service activity to serve particular needs of the public and for which service they are reasonably compensated. (See *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 816 and fn. 5 [258 Cal.Rptr. 161, 771 P.2d 1247] holding that insurance rates must be set by the commissioner of insurance so as to permit insurers to earn a fair and reasonable return; see also *20th Century Ins. Co.* v. *Garamendi, supra,* 8 Cal.4th 216.)

Insurance companies are in the business of insuring against risks, and presumably set their rates accordingly. (See *Barrera* v. *State Farm Mut. Automobile Ins. Co., supra,* 71 Cal.2d at pp. 669-670: " 'Insurance companies are engaged in the business of running risks for pay; . . .' ") Allowing insurance companies to negligently refuse to pay, or delay paying, legitimate business obligations which were reasonably foreseeable after due consideration of the risks involved *cannot* be condoned (as does the majority) by characterizing third party actions against such insurers as an unwarranted

expansion of tort liability, or by denying that such claimants can ever be the direct victims of insurers' negligent acts. Nor can it be condoned by asserting, as does the majority here, that "Insurance companies exist to provide a critical financial indemnity *for the risks of their insureds*, not to salve the feelings of displeased third party claimants."

It is clear, under our mandatory financial liability laws, as well as under California's Insurance Code, that insurers exist and are allowed to do business in California not only to provide their insureds with financial peace of mind, but to provide persons injured by their insureds with financial recompense for their injuries in a reasonable and good faith manner.

Just as public policy mandates that parents undertake the support of their own children, that spouses undertake each other's support, that employers, regardless of fault, bear the cost, through workers' compensation insurance, of work-related injuries to employees, that tortfeasors bear the cost of injuries they have caused to others by wrongful conduct or nonconduct—so that, at least in part, such burdens do not fall upon the general public—so too public policy mandates that insurance companies undertake the burden of fairly and timely settling those claims as alleged here, when the insured's liability is reasonably clear and the claimants' damages are reasonably ascertainable and which they have contracted to cover, for a price, rather than allowing such costs and expenses encompassed by the claimed damages to fall on the shoulders of the injured claimants, and, in some cases, on the doctors and hospitals whose bills will go unpaid, the welfare systems to whom the injured parties may be forced to turn, and ultimately on the taxpaying public.

### b. *Burden on Defendants*

The burden placed on defendants as insurers by requiring them to comply with a general standard of ordinary and reasonable care in the handling and payment of claims is not greater than the burden imposed on all other businesses, as well as individuals, to use such care in the management of their affairs, so as not to harm others.

### vii. *Availability, Cost and Prevalence of Insurance for the Risk Involved*

The record does not reveal the existence of any insurance which is available to insurers to insure them against the risk of their negligent mishandling of a third party insurance claim. But the existence or nonexistence of such insurance should not preclude an injured claimant from holding

the insurer accountable when it does not exercise reasonable care in handling and settling the claims and thereby causes harm to the claimant. Automobile casualty risk insurers whose assets, including reserves, are subject to regulation of the California Insurance Commissioner, pursuant to the Insurance Code and state regulations promulgated to implement the insurance law, in all likelihood would be able to acquire specialized insurance coverage for such risks at a fair premium.

Based on the foregoing consideration of the applicable public policy factors, it is my opinion that plaintiffs have alleged sufficient facts to establish that a common law duty and civil duty under section 1714 were imposed on defendants to exercise ordinary care to avoid causing plaintiffs, as third party claimants, the alleged emotional distress resulting from defendants' actions and inactions. These allegations are sufficient to establish them as direct victims. I conclude that plaintiffs have stated sufficient facts to allege defendants negligently breached that duty and such breach caused them emotional distress and resulting damages.

III

CONCLUSION

In my view, plaintiffs have stated sufficient facts to allege a cause of action for IIED and a cause of action for NIED, and the trial court erred in granting defendants' motion for a judgment on the pleadings as to all causes of action stated in plaintiffs' first amended complaint. I would reverse.